Argued and submitted November 5, 2001, judgment of conviction and sentence of death affirmed February 7, petition for reconsideration denied March 26, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# JESSE CALEB COMPTON,
*Appellant.*

## (CC 109705859A; SC S45905)

39 P3d 833

Mary M. Reese, Deputy Public Defender, Salem, argued the cause for appellant. With her on the briefs was David Groom, State Public Defender.

Jennifer Scott Lloyd, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Hardy Meyers, Attorney General, Michael D. Reynolds, Solicitor General, and Kathleen Cegla, Stacey RJ Guise, and Robert B. Rocklin, Assistant Attorneys General.

LEESON, J.

**LEESON, J.**

This is an automatic and direct review of a judgment of conviction and sentence of death. ORS 138.012(1); ORAP 12.10(1). Defendant seeks reversal of his convictions for aggravated murder, murder by abuse, two counts of sexual penetration in the first degree, and one count of abuse of a corpse in the second degree. In the alternative, defendant asks this court to vacate his sentence of death and to remand the case for resentencing. We affirm the judgment of conviction and the sentence of death.

## I.  FACTS

Because the jury found defendant guilty, we review the evidence in the light most favorable to the state. *State v. Hayward*, 327 Or 397, 399, 963 P2d 667 (1998).

Early in 1997, Stella Kiser and her daughter, Tesslynn O'Cull, began living with defendant in defendant's apartment. The child was approximately two-and-one-half years old when Kiser moved in with defendant. Defendant frequently hosted "drug parties" at his apartment, some of which lasted for several days. Defendant frequently prepared methamphetamine for smoking by melting it with a small propane torch. On at least one occasion, defendant held the lighted torch close to his hand to show his friends that he could withstand a great deal of pain.

Soon after Kiser and Tesslynn moved in with defendant, defendant began abusing Tesslynn. Defendant hit her on her buttocks and back with a wooden spoon, a spatula, and a belt. Visitors to the apartment observed defendant slap her in the face, drag her by her hair, force her to stand in the corner for long periods of time, and make her take long, cold baths or showers. Defendant frequently was angry at Tesslynn, and he called her disparaging names. Visitors also observed that defendant and Kiser usually kept Tesslynn in the bedroom during the drug parties, and they could hear the child cry for hours after defendant had been in the bedroom with her. Defendant would not permit others to go into the bedroom to help her. Eventually, defendant and Kiser kept Tesslynn in the bedroom most of the time. When a neighbor

complained about the way that defendant treated Tesslynn, defendant told him that he would kill the neighbor and the neighbor's girlfriend if they called the police.

Approximately two months before Tesslynn's death, defendant broke four vertebrae in her back. Sometime thereafter, he forcefully penetrated her vagina with an object and inflicted large, gaping burns on the child's back, buttocks, and genitals using an open flame. Some of those burns becme infected, and defendant poured rubbing alcohol into them. He also inflicted smaller round burns on the child's legs. During the two-week period before Tesslynn died, defendant immobilized her 10 to 15 times by placing her hands and feet over her head and tying them together with ropes, cords, or strips of cloth. He left her tied up for eight to ten hours at a time. Within 24-hours preceding the child's death, defendant struck her in the head several times, causing bruising to her brain, and either punched her in the abdomen or stomped on her with his foot, causing severe internal injuries. He also scraped and bruised her abdomen with a fork.

Defendant found Tesslynn dead in the bedroom of the apartment between midnight and 2:00 a.m. on June 14, 1997. Defendant cut Tesslynn loose from her restraints and tried to revive her by giving her CPR. He also struck her in the left side of the chest a few times with his fist, then applied a frayed, live electrical cord to her chest, and splashed her with cold water. He was unable to revive her.

Defendant and Kiser agreed to leave the body in the bedroom while they thought about what to do. Tesslynn's injuries were so extensive that defendant and Kiser feared that they would go to jail if anyone saw the body. Eventually, they decided to bury the body, which they did with the help of defendant's sister. In the days after they buried Tesslynn, defendant and Kiser were happy, playful, and affectionate with one another. They told friends that Tesslynn was with a babysitter or at Kiser's aunt's house and that they were planning to move out of town. They also told friends that they wanted to have a baby boy.

On the evening of June 16, 1997, defendant's sister told the Springfield Police Department that she had helped defendant and Kiser bury Tesslynn's body in the Sweet Home

area two days earlier. Early on the morning of June 17, Springfield police officers found the child's body buried in a shallow grave near a logging road in the area that defendant's sister had described. They unearthed the body and arranged for an autopsy. In the grave, they also found, among other things, a piece of cloth that appeared to be torn from a curtain, a strip of gray cloth, a blue braided belt, and a woman's ring with a pink stone in it.

That afternoon, police officers went to defendant's apartment. They advised defendant of his *Miranda* rights and obtained his permission to enter the apartment and to look around. Most of the apartment was dirty and smelled bad. There were many holes in the walls, which defendant had made by punching the walls when he was angry or by throwing knives.

In subsequent searches of the apartment, the police found drug paraphernalia, drug residue, and a propane torch. They also found a lamp with a cut cord, a pair of pliers with burn residue on it, rubbing alcohol bottles, and white cloths with knots in them. In a search of a dumpster near defendant's apartment, the police found two trash bags from defendant's apartment that contained a Mother's Day card for Kiser, child's clothing, an electrical cord that had been cut and had a frayed end, a blue cloth, a white cloth, and a shoestring with knots in them, and a rope. The cloth and shoestring had hair mixed in with the knots. Some of the cloth that the police found was similar to cloth that had been found in the child's grave.

The medical examiner who conducted the autopsy concluded that Tesslynn had died of shock, and he listed the cause of death as "battered child syndrome."[1] Defendant was indicted on six counts of aggravated murder, murder by abuse, first-degree sexual penetration, and second-degree abuse of a corpse. As noted, the jury convicted him of all counts, and he was sentenced to death. On review, defendant

---

[1] At trial, defendant's medical expert witness described battered child syndrome as a conglomeration of different events indicating that a child repetitively had been neglected or injured. Defendant's expert agreed with the medical examiner that Tesslynn was a victim of battered child syndrome.

raises 35 assignments of error. We analyze defendant's arguments in the context of pretrial issues, guilt-phase issues, and penalty-phase issues.

## II. PRETRIAL-PHASE ASSIGNMENTS OF ERROR

### A. *Denial of Demurrer to Count 1*

Count 1 of the indictment charged defendant with aggravated murder as follows:

> "The defendant, * * * on or about the 14th day of June, 1997, in the county aforesaid, in the course of or as a result of intentional maiming or torture of Tesslynn O'Cull, age three (3) years, did unlawfully and recklessly, under circumstances manifesting extreme indifference to the value of human life, cause the death of Tesslynn O'Cull, another human being; and defendant * * * previously engaged in a pattern or practice of assault or torture of Tesslynn O'Cull or another child under 14 years of age; contrary to statute and against the peace and dignity of the State of Oregon[.]"

Before trial, defendant filed a demurrer to that charge, contending that ORS 163.095(1)(e) is vague under both the Oregon Constitution and various provisions of the federal constitution. The trial court denied the demurrer.

On review, defendant contends that ORS 163.095(1)(e), either alone or in conjunction with ORS 163.115(1)(c), "is vague as to the mental state required with regard to the result of death when a homicide occurs as a result of maiming or torture[.]" Therefore, he argues, the statute violates Article I, sections 20 (equal privileges and immunities) and 21 (prohibiting *ex post facto* laws), of the Oregon Constitution, and the Eighth and Fourteenth Amendments to the United States Constitution. The state responds that defendant's claims were not properly raised by demurrer because they did not in fact raise a vagueness challenge. Instead, those claims raised questions of statutory construction, which is not a matter that can be raised by demurrer.

We analyze defendant's challenge as he has framed it, namely, as a vagueness challenge. The state concedes that a vagueness challenge is a valid basis for a demurrer. *See*

*State v. McKenzie*, 307 Or 554, 560, 771 P2d 264 (1989) (holding vagueness challenge proper basis for demurrer to indictment). On the merits, the state contends that the statutes defining aggravated murder by abuse are not vague because they clearly provide that the mental state with regard to causing death by abuse is recklessness.

This court has held that Article I, sections 20 and 21, of the Oregon Constitution, require the terms of a criminal statute to be explicit enough "to inform those who are subject to it of what conduct on their part will render them liable to its penalties." *State v. Plowman*, 314 Or 157, 160, 838 P2d 558 (1992) (quoting *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985)). In addition, a criminal statute "must not be so vague as to allow a judge or jury unbridled discretion to decide what conduct to punish." *Id.* at 161. To prevail on a facial vagueness challenge, a defendant must show that the statutes creating the crime of aggravated murder by abuse are vague in all their possible applications. *State v. Chakerian*, 325 Or 370, 381-82, 938 P2d 756 (1997).

ORS 163.115 defines murder by abuse, in part, as murder that occurs when a person "recklessly under circumstances manifesting extreme indifference to the value of human life" causes the death of a child under the age of 14 years. ORS 163.115(c). The mental state for causing death by abuse is recklessness.

ORS 163.095 provides that murder by abuse is aggravated murder if the homicide "occurred in the course of or as a result of intentional maiming or torture of the victim." ORS 163.095(1)(e). To prove intentional torture, the state must prove that the person intended to inflict intense physical pain on an unwilling victim. *State v. Cornell/Pinnell*, 304 Or 27, 31-32, 741 P2d 501 (1987); *see also State v. Langley*, 314 Or 247, 268, 839 P2d 692 (1992) ("The focus of a torture inquiry is not on the defendant's intent to cause the victim's death, but on the defendant's separate intent to cause intense physical pain.").

Read together, ORS 163.115(1)(c) and ORS 163.095(1)(e) make clear that a person commits murder by abuse if the person recklessly causes the death of a child under 14 years of age under circumstances manifesting

extreme indifference to the value of human life. For murder by abuse to be aggravated murder, the state also must prove that the homicide occurred in the course of or as a result of intentional maiming or torture of the victim. ORS 163.095(1)(e). The requirement that the state prove the intentional maiming or torture of the victim to prove aggravated murder does not alter the mental state for causing the victim's death, which is "recklessness." The statutes defining the crime of aggravated murder by abuse are not vague regarding the mental state for causing the victim's death. Accordingly, those statutes do not violate Article I, sections 20 and 21, of the Oregon Constitution.

■ Defendant also argues that the statutes violate the federal constitution for the same reasons that he advanced under the Oregon Constitution. Defendant is correct that the Due Process Clause of the Fourteenth Amendment prohibits states from enforcing vague criminal laws. *Lanzetta v. New Jersey*, 306 US 451, 458, 59 S Ct 618, 83 L Ed 888 (1939). However, a statute defining a criminal offense that gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited withstands a vagueness challenge. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 US 489, 498, 102 S Ct 1186, 71 L Ed 2d 362 (1982). For the reasons discussed above, the statutes defining aggravated murder by abuse meet that standard.[2] The trial court did not err in rejecting defendant's vagueness challenge to Count 1 of the indictment.[3]

---

[2] We do not address defendant's argument under the Eighth Amendment, because he did not raise it below. *See State v. Barone*, 329 Or 210, 243 n 23, 986 P2d 5 (1999) (declining to address argument made for first time on review). We also conclude that the argument does not reflect error apparent on the face of the record, because it does not raise an error of law that is obvious. *See State v. Reyes-Camarena*, 330 Or 431, 435-36, 7 P3d 522 (2000) (applying doctrine).

[3] We note that the United States Supreme Court has upheld the imposition of the death penalty without proof that the defendant possessed the intent to kill. In *Tison v. Arizona*, 481 US 137, 158, 107 S Ct 1676, 95 L Ed 2d 127 (1987), the Court held that, if a criminal defendant was a major participant in a felony and showed reckless indifference to human life, then the defendant could be sentenced to death even if the defendant did not intend to kill the victim. The Court reasoned that

"some intentional murderers may be among the most dangerous and inhumane of all - [including] the person who tortures another not caring whether the victim lives or dies * * *. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.' "

*Id.* at 157.

## B.  *Denial of Motion to Prohibit Death Penalty*

ORS 163.150(1)(a) (1995)[4] provides, in part:

"In the [sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to, victim impact evidence * * * and any aggravating or mitigating evidence relevant to [the fourth question under ORS 163.150(1)(b)(D), namely, whether the defendant should receive a death sentence]."

Before trial, defendant filed a "Motion to Prohibit Death Penalty," arguing that ORS 163.150(1) (1995) fails to provide the jury with "guided discretion" for making the decision whether a defendant should receive a death sentence. The trial court denied the motion.

On review, defendant contends that the trial court erred in denying his motion to prevent the death penalty because ORS 163.150(1) (1995), and its related jury instruction,[5] violate the Eighth and Fourteenth Amendments to the United States Constitution. That is so, defendant contends, because neither the statute nor the instruction informs the jury that it is entitled to consider aggravating factors only

---

[4] The legislature amended ORS 163.150(1)(a) in 1997. Or Laws 1997, ch 784, § 1.

[5] ORS 163.150(1)(c)(B) (1995) provides that, regarding the fourth question,

"the court *shall* instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

(Emphasis added.) Pursuant to that statute, the trial court gave the following jury instruction concerning the fourth question:

"The burden of proof beyond a reasonable doubt does not apply to this question. As to this question neither side bears any burden of proof. This question calls for a discretionary determination by each of you. If 12 jurors do not agree that the answer to this question is 'yes' then you must answer this question 'no.'

"Even though you have answered 'yes' to the first three questions, you are not required to answer 'yes' to this question. The purpose of this question is to allow each of you to take into account any mitigating circumstances that weighs against the sentence of death. Any one of you has the power and discretion to choose life imprisonment as the appropriate sentence. You must answer this question 'no' if one or more of the jurors find there is any aspect of the defendant's character, background, or any circumstances of the offense that one or more of the jurors believed would justify a sentence less than death."

insofar as they relate to defendant's character or to the circumstances of his crime in deciding whether to impose a death sentence. The state responds that, under the Eighth and Fourteenth Amendments, complete jury discretion is permissible regarding whether a particular defendant should receive a death sentence.

The United States Supreme Court has explained that there are two aspects of the capital sentencing process: the eligibility phase and the selection phase. *Buchanan v. Angelone*, 522 US 269, 275, 118 S Ct 757, 139 L Ed 2d 702 (1998). In the eligibility phase, "the jury narrows the class of defendants eligible for the death penalty" by finding a defendant guilty of aggravated murder. *Id.* In the selection phase, "the jury determines whether to impose a death sentence on an eligible defendant." *Id.* The Supreme Court has emphasized the need for channeling and limiting the jury's discretion in the eligibility phase, to ensure that the death penalty is not imposed arbitrarily or capriciously. *Id.* at 275-76. In the selection phase, by contrast, what is important is that there be "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 US 967, 972, 129 L Ed 2d 750, 114 S Ct 2630 (1994) (emphasis in original) (quoting *Zant v. Stephens*, 462 US 862, 879, 103 S Ct 2733, 77 L Ed 2d 235 (1983). In the selection phase, the Court has stated that "our decisions suggest that complete jury discretion is constitutionally permissible." *Buchanan*, 522 US at 276.

Similarly, in *California v. Ramos*, 463 US 992, 1008, 103 S Ct 3446, 77 L Ed 2d 1171 (1983), the Court held that, once a defendant has been found eligible for the death penalty, "the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Zant* provides an example of the Court's deference to states regarding the selection phase. In that case, the Court found no constitutional infirmity when a Georgia court instructed the jury in the selection phase to consider "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment as well as such arguments as have been presented for the State and for the Defense." *Zant*, 462 US at 878-80, 889 n 25.

■ Applying those standards, we cannot say that ORS 163.150(1) and its related jury instruction violate the Eighth or Fourteenth Amendments to the United States Constitution. The federal constitution does not require the court to instruct the jury in the penalty phase that it is entitled to consider only aggravating factors that relate to the defendant's character or to the circumstances of the defendant's crime in deciding whether to impose a death sentence. The trial court did not err in denying defendant's motion to prohibit the death penalty.

C. *Failure to Excuse Juror for Cause*

In responding to questions on a jury questionnaire and during initial questions during *voir dire*, one prospective juror, Burk, stated that she believed that criminal defendants should be required to prove their innocence, that the death penalty is appropriate for a brutal murder, and that she would follow her own beliefs if she were confronted with a jury instruction that was contrary to her beliefs. Based on those statements, defendant moved to excuse Burk from the jury. The prosecutor then explained to Burk that the state was required to prove defendant guilty of all the charges. Burk agreed with the prosecutor that, if criminal charges were filed against her, the state would be required to prove the charges and that she would not have to disprove them. The following colloquy then occurred:

"Q. [Prosecutor]: And would you accept that same circumstance for this defendant?

"A. I see what he is saying now. Yeah, I understand now.

"Q. If you were to sit on this jury and the State put on its case and defendant didn't put on any evidence at all, would you be able to say to all of us now that you wouldn't hold that against him because it's not his obligation to prove anything?

[Prosecutor repeats question at Burk's request.]

"A. No, I wouldn't hold it against him.

"Q. The State is required to prove to your satisfaction beyond a reasonable doubt that the defendant did it.

"A.  Yes.

"Q.  We don't want to convict people [who] aren't guilty.

"A.  Right."

Based on Burk's answers to those questions, the prosecutor opposed defendant's motion to excuse Burk from the jury, and the trial court denied the motion. Burk was not excused.

Defendant contends that Burk's answers to the jury questionnaire and initial questions during *voir dire* demonstrate that she was biased. He argues that the trial court's denial of his motion to excuse Burk violated his right to an impartial jury under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the federal constitution.[6] The state responds that, viewed in their entirety, Burk's statements demonstrated that she would be a fair and impartial juror.

Actual bias is a basis for challenging prospective jurors. *See* ORCP 57 D(1)(g) (incorporated by reference and made applicable to criminal trials in ORS 136.210(1)). In deciding whether a juror should be excused, "the test is whether the prospective juror's ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." *State v. Barone*, 328 Or 68, 74, 969 P2d 1013 (1998); *see also Patton v. Yount*, 467 US 1025, 1036, 81 L Ed 2d 847, 104 S Ct 2885 (1984) (to same effect). Whether a prospective juror actually is biased is a factual question "to be determined by the trial court in the exercise of its discretion." *State v. Montez*, 309 Or 564, 574-75, 789 P2d 1352 (1990). Because the trial court has the advantage of observing a challenged prospective juror's demeanor, apparent intelligence, and candor, that court's judgment as to the prospective juror's ultimate qualifications is entitled to great weight. *Id.* at 575. This court will not disturb a trial court's ruling on the matter absent a manifest abuse of discretion. *State v.*

---

[6] Defendant does not argue that, in this context, the Oregon constitutional guarantee differs from that of the United States Constitution. *See State v. Barone*, 328 Or 68, 71 n 2, 969 P2d 1013 (1998) (analyzing state and federal constitutional claims together in context of motion to exclude jurors for cause in absence of argument to contrary).

*Nefstad,* 309 Or 523, 528, 789 P2d 1326 (1990). We give greatest deference to the trial court when a juror's answers are contradictory or unclear. *See Barone,* 328 Or at 78 (so stating).

■    The record reveals that, once she understood the role of a juror and the responsibility of the state to prove defendant guilty beyond a reasonable doubt, Burk expressed her willingness to perform the tasks of a juror in the manner required by law. The trial court, having had the opportunity to observe Burk's demeanor, candor, and apparent intelligence, concluded that she would be a fair and impartial juror. Defendant has not demonstrated that the trial court manifestly abused its discretion in denying defendant's motion to excuse Burk.

D.   *Exclusion of Nonregistered Voters and Felons From Jury*

Before jury selection, the trial court asked the potential jurors if any of them were not registered to vote or if any had been convicted of a felony in the last 15 years. Based on their responses, and over defendant's objection, the court excused at least four potential jurors because they were not registered to vote. The trial court relied on Oregon Laws 1997, chapter 313, section 9b (E) and (F) (hereafter referred to as SB (Senate Bill) 936),[7] in excluding the jurors.

Defendant makes several global arguments challenging the constitutionality of SB 936. Defendant acknowledges that the same global challenges were before this court

---

[7] SB 936 (1997) was a legislative paraphrase of selected provisions of an amendment to the Oregon Constitution that was known as Ballot Measure 40 (1996) and modified several parts of the Oregon Constitution relating to the criminal law. Measure 40 became Article I, section 42, of the Oregon Constitution, on December 5, 1996. Or Laws 1997, v 1, at ix-x. In *Armatta v. Kitzhaber,* 327 Or 250, 254-55, 959 P2d 49 (1998), this court declared Measure 40 unconstitutional. In 1997, the legislature passed SB 936, which became effective June 12, 1997. Section 9b of SB 936 expired on July 1, 1999. Or Laws 1997, ch 313, § 9a(2).

Section 9b(3) provided, in part, that

"[a]ny person is eligible to act as a juror in a criminal trial, beginning on or after December 5, 1996, unless the person:

"* * * * *

"(E)  Has been convicted of a felony or served a felony sentence within the prior 15 years; or

"(F)  Is not registered to vote."

in *State v. Fugate*, 332 Or 195, 26 P3d 802 (2001), which had not been decided when defendant filed his brief in this case. In *Fugate*, the court rejected those challenges.

With respect to specific provisions of SB 936, defendant contends that excluding nonregistered voters and felons from jury service deprived him of his right to trial by a jury that reflected a fair cross-section of the community under the Sixth Amendment to the United States Constitution[8] and what he views as the same right under Article I, section 11, of the Oregon Constitution.[9] In defendant's view, nonregistered voters and felons are more likely to have a "watchdog" attitude toward an overzealous government than are registered voters and those who have not been convicted of a felony, and, therefore, those groups cannot be excluded from jury service without violating the constitutional requirement that a jury pool represent a fair cross-section of the community.

Normally, this court addresses issues of state constitutional law before resolving issues of federal constitutional law. *See State v. Cookman*, 324 Or 19, 25, 920 P2d 1086 (1996) (explaining paradigm of analyzing state constitutional claims before federal constitutional claims). In this case, however, defendant has not suggested any different analysis under the Oregon Constitution than under the federal constitution. Accordingly, for purpose of this case, we assume, without deciding, that the state and federal guarantees are the same. *See State v. Rogers*, 313 Or 356, 363, 836 P2d 1308 (1992) (presuming same analysis of venue issue under Article I, section 11, and Sixth Amendment, because defendant did not suggest different analysis under state and federal constitutions).[10]

---

[8] The Sixth Amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

[9] Article I, section 11, of the Oregon Constitution, provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."

[10] We note that, in *State v. Amini*, 331 Or 384, 389, 15 P3d 541 (2000), this court held that Article I, section 11, does not incorporate a broad fairness standard for reviewing a jury instruction. Rather, the guarantee is trial by a jury that is not prejudiced or biased. *Id.* at 391.

██ ██ Defendant argues that exclusion of nonregistered voters and felons from the jury pool violates his Sixth Amendment right to have his jury drawn from a "fair cross-section of the community." We begin by noting that, under the Sixth Amendment, a person who has been charged with a serious offense has a fundamental right to a trial by jury. *Duncan v. Louisana*, 391 US 145, 158, 88 S Ct 1444, 20 L Ed 2d 491 (1968). That right encompasses trial by a jury that is drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 US 522, 530, 95 S Ct 692, 42 L Ed 2d 690 (1975). The United States Supreme Court has held that one aspect of the fair cross-section requirement is that any group that the law excludes from jury service not be a "distinctive group" within the community. *Duren v. Missouri*, 439 US 357, 364, 99 S Ct 664, 58 L Ed 2d 579 (1979). However, the fair cross-section requirement does not mean that the jury must "mirror" the community from which it is selected. *Id.* at 364 n 20.

Defendant relies on the three-pronged test adopted in *United States v. Guzman*, 337 F Supp, 140, 143-44 (SDNY), *aff'd on other grounds* 468 F2d 1245 (2nd Cir 1972), for his argument that nonregistered voters and felons are "cognizable groups" that SB 936 cannot exclude from jury service without violating the Sixth Amendment.[11] The state responds that, even assuming that the *Guzman* test is a correct statement of federal law, it does not aid defendant here, because nonregistered voters and felons do not satisfy the first prong of that test.

██ We find no cases, and defendant identifies none, in which a federal circuit court has adopted the *Guzman* test.

---

[11] Under the *Guzman* test,

"[a] cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily classified. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interests which cannot be adequately protected by the rest of the populace."

*Guzman*, 337 F Supp at 143-44.

Rather, federal circuit courts have held that a group is distinctive under *Duren* if:

> "(1) the group is defined and limited by some factor, (2) a common thread or basic similarity in attitude, ideas, or experience runs through the group, and (3) there is a community of interests among members of the group such that the groups interest cannot be adequately represented if the group is excluded from the jury selection process."

*See United States v. Fletcher*, 965 F2d 781, 782 (9th Cir 1992) (adopting test from Eleventh Circuit). Federal courts consistently have held that nonregistered voters do not comprise a distinctive group. *See Murrah v. Arkansas*, 532 F2d 105 (8th Cir 1976) (so holding and identifying other courts in accord). Although convicted felons are defined by a common factor, namely, that they have been found guilty of violating the law, their reasons and ways of doing so are many and varied. A person who has committed a felony offense by violating environmental or tax laws, for example, does not necessarily have the same "attitude, ideas, or experience" as a person who has committed robbery or rape. Thus, although felons as a group arguably might satisfy the first prong of the *Fletcher* test, they do not satisfy the other two prongs. We have little difficulty concluding that felons, like nonregistered voters, are not a distinctive group for purposes of the fair cross-section requirement under the Sixth Amendment. *See, e.g., United States v. Barry*, 71 F3d 1269 (7th Cir 1995) (holding persons charged with felonies not distinctive group). We therefore conclude that defendant's fair cross-section argument fails under the federal constitution. As explained above, because defendant has not suggested a different analysis under Article I, section 11, his fair cross-section argument also fails under the Oregon Constitution. The trial court did not err in asking potential jurors if they were not registered voters or had been convicted of a felony in the last 15 years, and in excusing those who responded affirmatively.

We do not address defendant's other challenges to SB 936, section 9(b), because he did not raise them below. *See State v. Barone*, 329 Or 210, 243 n 23, 986 P2d 5 (1999) (declining to address argument made for first time on appeal). We have reviewed those unpreserved challenges and conclude that none reflects error apparent on the face of the

record, because none raises an error of law that is obvious. *See State v. Reyes-Camarena*, 330 Or 431, 435-36, 7 P3d 522 (2000) (applying doctrine). We have reviewed defendant's remaining assignments of error regarding pretrial issues and reject them without further discussion.

## III. GUILT-PHASE ASSIGNMENTS OF ERROR

Defendant asserts that the trial court committed 17 reversible errors during the guilt phase of defendant's trial. Defendant concedes that 10 of those alleged errors are not preserved. We have reviewed each unpreserved claim of error and conclude that none reflects error apparent on the face of the record, because none raises an error of law that is obvious. *See Reyes-Camarena*, 330 Or at 435-36 (applying doctrine).[12]

We also have reviewed defendant's remaining assignments of error and reject them without further discussion.

## IV. PENALTY-PHASE ASSIGNMENTS OF ERROR

Defendant raises several assignments of error regarding the penalty phase.

### A. *Denial of Motion for Mistrial*

At sentencing, the state contended that defendant should receive a death sentence. To impose that sentence, the jury had to find beyond a reasonable doubt, among other things, that defendant's conduct that caused Tesslynn's death was committed deliberately and with the reasonable expectation that her death would result. *See* ORS 163.150(1)(b)(A) (1995) (describing sentencing factor). In his

---

[12] We note that defendant's 20th and 23rd assignments of error are based on a premise that we have rejected earlier in this opinion. Defendant contends that, because ORS 163.115(1)(c) and ORS 163.095(1)(e) are vague regarding the mental state required for the death that results from a pattern or practice of abuse or torture, the trial court erred in instructing the jury that the state had to prove, among other things, that defendant "recklessly caused the death of Tesslynn O'Cull under circumstances manifesting extreme indifference to the value of human life." Defendant did not object to that instruction. Because, as we have held, the statutes are not vague regarding the mental state required for causing the victim's death, defendant's argument does not raise an error of law that is obvious. Therefore, there is no error apparent on the face of the record. *See Reyes-Camarena*, 330 Or at 435-36 (applying doctrine).

closing argument, defense counsel contended that, even assuming that defendant deliberately had engaged in the conduct that killed Tesslynn, he had not done so with a reasonable expectation that her death would follow. Rather, counsel argued, shock had caused the child's death, which is a phenomenon that a lay person would not know about and which sometimes "sneaks up" even on doctors.

In response to defendant's argument, the prosecutor argued as follows:

"Deliberately means a state of mind that examines and considers the contemplated act * * * [and] whether that act should or shouldn't be done. Deliberation is present if the thinking is done in a cool mental state under such circumstances and for such period of time as to permit a careful weighing of the proposed decision.

"I want you to unfortunately, I am going to draw you back a little bit to what was going on in that home the last few days of Tesslynn's life.

"What we know pretty clearly is there was a violent blow at least to her back and perhaps a violent blow to her abdomen that caused internal bleeding. We know she was sexually abused as she was vaginally penetrated within the last couple days of her life.

"We know the night she died she was tied up with her legs up over her head. We know she had vomited. By all accounts the abdominal bleed was apparently causing her some distress and we know, I think logically, that the defendant was well aware that the child was in some severe distress, and that alone might be enough for deliberation but I want you to think about the condition that this little girl was in when those terrible injuries in and of themselves were inflicted on her.

"You can look at the pictures and see that the labia is essentially burned off, and whether or not it is burned off by boiling water poured over her anal area when she was tied up, or whether or not it's burned off by * * * a propane torch doesn't really matter.

"*When [defendant] is sexually abusing her he is looking at the full sight, sound[,] smell, package of that child. She must have begged for mercy. She must have expressed the terrible pain she felt, and he went on anyway.*

"I guess she was probably crying when he stomped on her back, and think about what he was stomping on, a little girl, 31 pounds, damaged almost beyond repair, beaten repeatedly, fed occasionally, tied up, sexually abused, burned with cigarettes, for weeks even months.

"Did he deliberately do those acts? What other word would you put with it? He extremely deliberately did those acts. He knew exactly what he was doing. Was it reasonable for him to expect her to die? Could she survive another week in this household? Would she have lived another week? Ask yourself that. Probably not. Would she have lived another month? No. Was he going to kill her one day or another?

*"Think about what she must have felt in the bedroom, internally bleeding, tied up while her mother and [defendant] partied in the other room. What a terrible, torturous, brutal way to die. It would be terrible for all of us for adults, but for a little girl just turned three years old the week before, it must have been much more terrifying, much more hard to understand.*

"Were the acts deliberate? Absolutely."

(Emphasis added.) During that part of prosecutor's closing argument, one juror began to cry. Defendant moved for a mistrial on the ground that the prosecutor intentionally was "inflaming the jury in the manner and directness of his argument, using voice and everything else he can to inflame them improperly * * *." The trial court denied the motion and, with defendant's agreement, selected an alternate juror to replace the juror who had begun to cry.

Before this court, defendant contends that the trial court abused its discretion in denying his motion for a mistrial. He also argues that the parts of the prosecutor's statements emphasized above violated his right to due process under the Fourteenth Amendment and deprived the sentencing proceeding of the reliability that the Eighth Amendment requires. The state responds that defendant's objection did not preserve the constitutional arguments that he raises here. On the merits, the state responds that the prosecutor's statements were relevant to issues at sentencing and that the emotional overtones of the argument did not make it improper. Therefore, the state contends, the trial court did

not abuse its discretion in denying defendant's motion for a mistrial, and no constitutional violation occurred.

We conclude that defendant's objection was sufficient to put the trial court on notice that, in defendant's view, the prosecutor's statements denied defendant his right to a fair sentencing proceeding, whether that right is grounded in the Eighth and Fourteenth Amendments to the United States Constitution or derives from some other source. We turn to the merits.

Defendant argues that the prosecutor "veered off topic and exhorted the jury to feel what [Tesslynn] must have felt in her last moments." That, he contends, was improper, because, in doing so, the prosecutor "asked the jury to engage in speculation and to rely on facts not in evidence," and because "the argument's purpose could only have been to evoke an emotional response from the jury." The state contends that the prosecutor did not ask the jury to engage in speculation about Tesslynn's uncommunicated thoughts and feelings. Rather, he "sought to convey what one can infer that [Tesslynn] *did* communicate to defendant." (Emphasis in original.) Therefore, the prosecutor's statements helped to establish that defendant was aware of the pain that Tesslynn had suffered from the injuries that he had caused and that he nonetheless chose to inflict even more severe injuries that ultimately caused her death.

This court consistently has held that a motion for a mistrial is addressed to the sound discretion of the trial judge. *State v. Jones*, 242 Or 427, 433, 410 P2d 219 (1966). Even if we find the prosecutor's remarks to be "improper, tasteless, or inappropriate," we will not find an abuse of discretion unless the effect of the remarks is to deny a defendant a fair trial. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990).

In our view, the allegedly objectionable remarks in this case did not violate that standard. The prosecutor's argument called for the jury to make inferences about how Tesslynn must have responded to the injuries that defendant had inflicted on her. Those inferences reasonably were related to the nature and extent of Tesslynn's injuries.

Moreover, the prosecutor's argument that Tesslynn must have communicated her suffering and that defendant must have been aware of it responded to defendant's contention that he had not acted deliberately and with a reasonable expectation that death would result. Defendant's willingness to inflict additional injuries the night of Tesslynn's death, even though he knew that she already was in pain from internal injuries, extensive burns, and from being tied up, helped to establish that he acted deliberately and with the reasonable expectation that her death would result.

■ Although we question the propriety of the prosecutor's comments regarding Tesslynn's feelings and inability to understand what was happening to her, we cannot conclude that those comments, alone, were egregious enough to make the sentencing proceeding unfair. *See Smith*, 310 Or at 27 (concluding that prosecutors's comments, during closing argument of capital sentencing proceeding, regarding victim's last thoughts and feelings were "more gratuitous than inflammatory"). Consistent with this court's decision in *Smith*, we decline defendant's invitation to create a rule that requires a new sentencing proceeding whenever a prosecutor makes a comment that arguably asks jurors to imagine what a victim thought or felt.

■ We turn to defendant's claim that the prosecutor's closing argument in the penalty phase violated his right to due process under the Fourteenth Amendment. Federal courts have held that a prosecutor's statements in asking for a particular penalty must be confined to issues relevant to factors that the jury may consider at the sentencing proceeding. *See, e.g., Coleman v. Brown*, 802 F2d 1227, 1239 (10th Cir 1986) (so stating). Courts have acknowledged that some emotion is inevitable in capital sentencing, *see, e.g., Brooks v. Kemp*, 762 F2d 1383, 1404-05 (11th Cir 1985), and that "appeals to emotion *ordinarily* do not alone render an argument improper," *Coleman* at 1239 (emphasis in original). However, even if a prosecutor's comments are improper, there is no violation of due process unless those comments result in a sentencing proceeding that is "fundamentally unfair." *See Donnelly v. DeChristoforo*, 416 US 637, 645, 94 S Ct 1868, 40 L Ed 2d 431 (1974) (establishing, in habeas proceeding, "fundamental fairness" standard for prosecutorial misconduct at guilt phase).

As we have explained above, the prosecutor's arguments in this case related to an element that was essential to the jury's deliberation in the penalty phase, namely, whether defendant had engaged in conduct deliberately and with a reasonable expectation that Tesslynn's death would result. A certain degree of emotion was inevitable at defendant's sentencing hearing, given the nature and extent of Tesslynn's injuries. Even assuming that some of the allegedly objectionable comments were improper, we do not think that those comments resulted in a fundamentally unfair sentencing proceeding.

We reject defendant's Eighth Amendment claim for the same reasons. The statements to which defendant objects did not result in a sentence that was imposed arbitrarily and capriciously. *See Gregg v. Georgia*, 428 US 153, 189, 96 S Ct 2909, 2932, 49 L Ed 2d 859 (1976) (under Eighth Amendment, sentencing discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action").

## B. *Imposition of Death Sentence*

Defendant contends that the trial court erred when it imposed a sentence of death for defendant's conviction for aggravated murder as pleaded in Count 1 of the indictment. The first question under ORS 163.150(1)(b) (1995) is "[w]hether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result." Defendant maintains that that question is an element of the crime of aggravated murder that had to be pleaded in the indictment. Because the element of deliberateness was not pleaded, defendant argues, the trial court lacked authority to submit defendant's case to the jury for a finding on that issue and therefore lacked authority to impose a death sentence.

Defendant admits that he did not object in the trial court to his sentence on the grounds asserted here. However, defendant argues that the state's failure to plead "deliberateness" in the indictment deprived the trial court of subject matter jurisdiction and that lack of subject matter jurisdiction can be raised at any stage of the proceedings. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 383, 823 P2d 956 (1991)

(lack of subject matter jurisdiction may be raised at any time, including on appeal). Defendant also argues that this court should review the matter as "error apparent on the face of the record."

Defendant concedes that the identical issue was before this court in *State v. Terry*, 333 Or 163, 37 P3d 157 (2001). In that case, this court rejected the defendant's jurisdictional argument and his argument that the alleged error was "error apparent on the face of the record." We reject defendant's claim in this case for the same reasons. We have reviewed each of defendant's other assignments of error regarding the penalty phase and reject them without further discussion.

## V.   CONCLUSION

Having reviewed each assignment of error and each argument under each assignment, we conclude that the trial court did not err in entering judgment on defendant's convictions for aggravated murder, murder by abuse, two counts of sexual penetration in the first degree, and one count of abuse of a corpse in the second degree, or in imposing a sentence of death.

The judgment of conviction and sentence of death are affirmed.