Argued and submitted January 6, judgment of conviction and sentence of death affirmed October 23, reconsideration denied December 9, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## JESSE STUART FANUS,
*Appellant.*

## (C98CR1510FE; SC S46472)

79 P3d 847

Dan Maloney, Deputy Public Defender, Salem, argued the cause and submitted the brief for appellant. With him on the brief was David E. Groom, State Public Defender.

Kaye E. McDonald, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Christina M. Hutchins, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.*

---

\* Leeson, J., resigned January 31, 2003, and did not participate in the decision of this case. Kistler, J., did not participate in the consideration or decision of this case.

CARSON, C. J.

## CARSON, C. J.

This case is before the court on automatic and direct review of a judgment of conviction and sentence of death following defendant's convictions for two counts of aggravated murder involving a single victim and 11 additional felony convictions. *Former* ORS 163.150(1)(g) (1997), *repealed by* Or Laws 1999, ch 1055, § 1;[1] ORAP 12.10. On review, defendant asks this court to reverse his convictions or, alternatively, to vacate his sentence of death and remand for resentencing. For the reasons set out below, we affirm defendant's convictions and the sentence of death.

## I. FACTS AND PROCEDURAL BACKGROUND

On the night of June 28, 1998, defendant broke into the home of the victim, Major General Marion Carl, and his wife, Edna Carl, in Douglas County, Oregon. Defendant was armed with a shotgun that he had stolen from D & D Towing, a Roseburg vehicle towing business, on or around June 17, 1998. Defendant shot and killed Marion Carl, and shot and wounded Edna Carl. Defendant then forced Edna Carl at gunpoint to give him several hundred dollars and the keys to the Carls' vehicle.

On July 5, 1998, defendant was arrested in Pasadena, California and, subsequently, was extradited to Oregon. For his crimes on June 28, 1998, the state charged defendant with two counts of aggravated murder, ORS 163.095; two counts of felony murder, ORS 163.115 (1997);[2] one count of murder, ORS 163.115 (1997); two counts of attempted aggravated murder, ORS 161.405 and ORS 163.095; one count of attempted murder, ORS 161.405 and ORS 163.115 (1997); one count of first-degree robbery with a firearm, ORS 164.415 and ORS 161.610 (1997);[3] one count of second-degree assault with a firearm, ORS 163.175 and ORS 161.610 (1997); and one count of first-degree burglary with a

---

[1] This court's automatic and direct review of a judgment of conviction and sentence of death now is provided under ORS 138.012.

[2] In 1999, the legislature amended ORS 163.115 in a way that is not relevant to our discussion. Or Laws 1999, ch 782, § 4.

[3] In 1999, the legislature amended ORS 161.610 in a way that is not relevant to our discussion. Or Laws 1999, ch 951, § 3.

firearm, ORS 164.225 and ORS 161.610 (1997). For his burglary of D & D Towing on or around June 17, 1998, the state charged defendant with one count of second-degree burglary, ORS 164.215; and one count of first-degree theft, ORS 164.055. At trial in April 1999, a Douglas County jury convicted defendant of all 13 counts. After a separate penalty-phase proceeding on the two counts of aggravated murder, in which the jury unanimously answered yes to the four questions set out in ORS 163.150(1)(b),[4] the trial court entered a sentence of death.

On review, defendant raises 19 assignments of error. A number of those assignments were not preserved for review or otherwise are not well taken. We discuss defendant's remaining arguments as he presents them: pre-trial-phase issues, guilt-phase issues, and penalty-phase issues.

## II. PRE-TRIAL-PHASE ASSIGNMENTS OF ERROR

### A. *Trial Court's Denial of Defendant's Demurrer*

■■ Defendant asserts that the trial court erred by overruling his pretrial demurrer to the indictment, in which, among other things, he raised a number of constitutional challenges to Oregon's death-penalty statutes. The trial court denied defendant's demurrer because it concluded that none of his arguments was well taken.

---

[4] In a death-penalty sentencing proceeding, ORS 163.150(1)(b) requires that the jury affirmatively answer the following four questions:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

The jury considers the third question set out in ORS 163.150(1)(b)(C), regarding provocation by the victim, only when that question is relevant under the facts of the case. *See, e.g., State v. Terry*, 333 Or 163, 182-83 n 12, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002) (question set out in ORS 163.150(1)(b)(C) not submitted to jury). As noted above, in this case, the jury considered all four statutory questions.

Defendant first contends that the trial court should have sustained his demurrer because, according to defendant, ORS 163.150(1)(a) and its related jury instruction set out in ORS 163.150(1)(c)(B) (1997)[5] violate the Eighth Amendment to the United States Constitution.[6] That is so, defendant argues, because neither ORS 163.150(1)(a) nor the jury instruction set out in ORS 163.150(1)(c)(B) (1997) sufficiently limit the aggravating evidence that the state may introduce or that a jury may consider in relation to the question set out in ORS 163.150(1)(b)(D), that is, "[w]hether the defendant should receive a death sentence."

Before addressing the merits, we consider the state's argument that this court should not consider defendant's constitutional claims because those challenges were not raised properly by a demurrer. According to the state, because defendant challenges the constitutionality of only the sentencing statute for aggravated murder, his claims do not relate to a defect appearing on the face of the indictment and are not among the grounds for a pretrial demurrer under ORS 135.630.[7]

---

[5] In 2001, the legislature amended ORS 163.150(1)(c)(B) in a way that is not relevant to our discussion. Or Laws 2001, ch 306, § 1.

[6] The Eighth Amendment provides, in part, that "cruel and unusual punishments [shall not be] inflicted." The Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Furman v. Georgia*, 408 US 238, 239-40, 92 S Ct 2726, 33 L Ed 2d 346 (1972).

[7] ORS 135.630 provides:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"(1) If the accusatory instrument is an indictment, that the grand jury by which it was found had no legal authority to inquire into the crime charged because the same is not triable within the county;

"(2) If the accusatory instrument is an indictment, that it does not substantially conform to the requirements of ORS 132.510 to 132.560, 135.713, 135.715, 135.717 to 135.737, 135.740 and 135.743;

"(3) That the accusatory instrument charges more than one offense not separately stated;

"(4) That the facts stated do not constitute an offense;

"(5) That the accusatory instrument contains matter which, if true, would constitute a legal justification or excuse of the offense charged or other legal bar to the action; or

"(6) That the accusatory instrument is not definite and certain."

For that proposition, the state relies upon this court's decision in *State v. Pinnell*, 319 Or 438, 877 P2d 635 (1994). In that case, the defendant had demurred to the possible application of the "true-life" sentencing option[8] to his particular case upon the ground that such an application would amount to an unconstitutional imposition of an *ex post facto* law. *Id.* at 443-44. This court held that the trial court had not erred in overruling the defendant's demurrer because this court concluded that the possibility of an unconstitutional application of that sentencing option to the defendant's case was not a defect appearing on the face of the accusatory instrument or otherwise grounds for demurrer under ORS 135.630. *Id.* at 444.

■ By contrast to the defendant in *Pinnell*, however, defendant here raises *facial* challenges to the constitutionality of Oregon's sentencing statute for aggravated murder. In *City of Portland v. Dollarhide*, 300 Or 490, 495-96, 714 P2d 220 (1986), this court explained that, when a defendant is charged under a criminal law for which only an allegedly invalid penalty is provided, the defendant may challenge that penalty provision by a pretrial demurrer because, without a valid penalty, the charge cannot stand.[9] *See also* ORS 135.630(4) ("The defendant may demur to the accusatory instrument when it appears upon the face thereof * * * [t]hat the facts stated do not constitute an offense[.]"). That reasoning applies here.

---

[8] *See* ORS 163.105(1)(a) (providing for sentencing option of "life imprisonment without possibility of release or parole"); ORS 163.150(2)(a) (providing that, if penalty-phase jury does not impose death sentence, trial court shall sentence defendant to "life imprisonment without possibility of release or parole," unless 10 or more jurors find sufficient mitigating evidence to warrant sentence of life imprisonment for minimum of 30 years).

[9] We note, as did the court in *Dollarhide*, that the determination that the penalty provision of a statute is invalid does not require necessarily the dismissal of the complaint. *See Dollarhide*, 300 Or at 503-05 (trial court erred in dismissing complaint after finding penalty provision invalid, because invalid penalty provision was severable and, upon conviction, defendant could be sentenced to penalty provided in general penalty provision); *see also* ORS 174.040 (providing that, if any part of statute held unconstitutional, remaining parts remain in force unless statute provides otherwise or unconstitutional part of statute is inseverable). Nevertheless, when a defendant alleges that only an invalid penalty is applicable to a charged offense, the defendant's challenge relates to whether the facts stated constitute an offense and is grounds for a pretrial demurrer under ORS 135.630(4).

Under ORS 163.105(1)(a),[10] when a defendant is convicted of aggravated murder, the trial court must sentence the defendant according to the statutory sentencing provisions set out in ORS 163.150. The parts of ORS 163.150 that defendant challenged here apply only when the trial court submits to a jury the sentencing option of death. ORS 163.150(1)(a);[11] ORS 163.150(3)(a) (1997).[12] However, when, as in this case, the defendant is eligible for the death sentence, and the state elects to present evidence for the purpose of sentencing the defendant to death, then the trial court must submit to the jury that sentencing option, and it must apply those parts of ORS 163.150 that defendant challenged as unconstitutional to determine the defendant's penalty. *See* ORS 163.150(1). Thus, because, as in *Dollarhide*, defendant's constitutional challenges related to the only penalty provision that applied to the charges of aggravated murder

---

[10] ORS 163.105(1)(a) provides:

"Except as otherwise provided in ORS 137.700, when a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment."

[11] ORS 163.150(1)(a) provides, in part:

"Upon a finding that the defendant is guilty of aggravated murder, the court, except as otherwise provided in subsection (3) of this section, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death."

[12] ORS 163.150(3)(a) (1997) provided, in part:

"When the defendant is found guilty of aggravated murder upon a plea of guilty or no contest prior to the introduction of evidence before the trier of fact, and the state advises the court on the record that the state declines to present evidence for purposes of sentencing the defendant to death, the court:

"(A) Shall not conduct a sentencing proceeding as described in subsection (1) of this section, and a sentence of death shall not be ordered.

"(B) Shall conduct a sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment without the possibility of release or parole as described in ORS 163.150(1)(b) or life imprisonment as described in ORS 163.150(1)(c). * * * The procedure for the sentencing proceeding, whether before a court or a jury, shall follow the procedure of subsection (1)(a) and subsection (2) of this section, as modified by this subsection which prohibits a sentence of death when the state declines to present evidence."

In 1999 and 2001, the legislature amended ORS 163.150(3)(a) in ways not relevant to our discussion. Or Laws 1999, ch 1055, § 1; Or Laws 2001, ch 306, § 1.

against defendant here, defendant properly raised those challenges by a pretrial demurrer. *See, e.g., State v. Moore*, 324 Or 396, 429-34, 927 P2d 1073 (1996) (considering defendant's constitutional challenges to Oregon's death-penalty statutes raised by demurrer).

We turn to the merits of defendant's first constitutional claim. As noted, defendant argues that ORS 163.150(1)(a) and its related jury instruction set out in ORS 163.150(1)(c)(B) (1997) violate the Eighth Amendment because those statutes do not limit sufficiently the aggravating evidence that the state may introduce or that the jury may consider in relation to the question set out in ORS 163.150(1)(b)(D), that is, "[w]hether the defendant should receive a death sentence." Defendant essentially argues that, because ORS 163.150(1)(a) and ORS 163.150(1)(c)(B) (1997) allow the state to introduce, and the jury to consider, "aggravating evidence" in relation to the question set out in ORS 163.150(1)(b)(D), but do not provide guidance as to the meaning of that term, the statutes do not prevent the state from introducing, or the jury from relying upon, factors that are irrelevant or constitutionally impermissible in deciding whether to impose a death sentence under ORS 163.150(1)(b)(D). We disagree.

We begin by providing background to place defendant's argument in context. As noted, in addition to the three other statutory questions that a jury must answer before a defendant may be sentenced to death, ORS 163.150(1)(b)(D) requires a jury to decide "[w]hether the defendant should receive a death sentence." This court previously has explained that the question set out in ORS 163.150(1)(b)(D) frames a discretionary determination for the jury and, therefore, does not carry a burden of proof. *See Moore*, 324 Or at 432 (so stating).

In 1995, the legislature amended ORS 163.150(1)(a) to provide explicitly that, in addition to mitigating evidence that the defendant may offer, a trial court also may admit victim impact evidence, as well as aggravating evidence that is specifically relevant to a jury's determination under ORS 163.150(1)(b)(D). That statute provides, in part:

"In the [sentencing proceeding], *evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to*, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and *any aggravating* or mitigating *evidence relevant to the* [*question set out in ORS 163.150(1)(b)(D)*]."

ORS 163.150(1)(a) (emphasis added).

Subsequently, in 1997, the legislature also amended ORS 163.150(1)(c)(B), the statutory jury instruction that a trial court must give to guide a jury's determination of the question under ORS 163.150(1)(b)(D). ORS 163.150(1)(c)(B) (1997) provided:

"The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in subsection (1)(a) of this section, one or more of the jurors believe that the defendant should not receive a death sentence."

Defendant in this case was sentenced under the 1997 version of ORS 163.150.

■ With that context in mind, we consider defendant's first constitutional claim. As this court observed in *State v. Compton*, 333 Or 274, 283-84, 39 P3d 833, *cert den*, 537 US 841 (2002), the United States Supreme Court has explained that, in the selection phase of a death-penalty proceeding,[13] "[w]hat is important * * * is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 US 862, 879, 103 S Ct 2733, 77 L Ed 2d 235 (1983) (emphasis in original). In providing such an individualized determination, the Court

---

[13] The Supreme Court characterizes the two phases of a death-penalty sentencing process as "the eligibility phase" and "the selection phase." *Buchanan v. Angelone*, 522 US 269, 275, 118 S Ct 757, 139 L Ed 2d 702 (1998). In the eligibility phase, the jury "narrows the class of defendants eligible for the death penalty[.]" *Id.* at 275. In the selection phase, the jury determines whether a defendant who is eligible to receive a death sentence in fact should receive that sentence. *Id. See also Compton*, 333 Or at 283 (explaining federal constitutional requirements for eligibility phase and selection phase of death-penalty proceedings).

has stated that "the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." *Tuilaepa v. California*, 512 US 967, 974, 114 S Ct 2630, 129 L Ed 2d 750 (1994). The Court has cautioned that a state may not attach an aggravating label to, or allow a jury to draw adverse inferences from, constitutionally protected conduct or factors that are irrelevant or constitutionally impermissible, such as the race or the religion of the defendant. *See, e.g., Dawson v. Delaware*, 503 US 159, 166-68, 112 S Ct 1093, 117 L Ed 2d 309 (1992) (state may not introduce evidence of defendant's membership in "Aryan Brotherhood" as "bad character" evidence); *Zant*, 462 US at 885 (state may not attach "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to sentencing process, such as defendant's race, religion, or political affiliation). However, subject to that constitutional limitation, the Court has stated that, under the Eighth Amendment, a jury is "free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos*, 463 US 992, 1008, 103 S Ct 3446, 77 L Ed 2d 1171 (1983).

In providing that a jury may have wide discretion under the Eighth Amendment in determining whether to impose a death sentence, the Supreme Court also has rejected the notion that a trial court must guide a jury's discretion by prescribing standards for the jury's evaluation of aggravating or mitigating facts and circumstances that either the state or the defendant might have introduced. *Zant*, 462 US at 875 (so stating). To that end, in *Gregg v. Georgia*, 428 US 153, 161, 203-04, 96 S Ct 2909, 49 L Ed 2d 859 (1976), the Court found no constitutional difficulty when the trial judge had instructed the jury that, "in determining what sentence was appropriate[,] the jury was free to consider the facts and circumstances, if any, presented by the parties in mitigation or aggravation." Similarly, in *Zant*, the Court approved a jury instruction that, under the same state statute at issue in *Gregg*, informed the jury to consider "all facts and circumstances presented in [extenuation], mitigation[,] and aggravation of punishment as well as such arguments as have been presented for the State and for the

Defense[.]" 462 US at 878-80, 889 n 25. *See also Tuilaepa*, 512 US at 978 (noting approval of jury instructions in *Zant* and *Gregg*).

As the foregoing cases illustrate, the Eighth Amendment does not prohibit the state from introducing a wide range of evidence for the jury's consideration in determining whether to impose a death sentence. Those cases also make clear that a jury instruction that directs a jury to consider both aggravating and mitigating facts and circumstances that either the state or the defendant might have introduced at trial does not offend the Eighth Amendment by providing insufficient guidance as to the evidence that a jury properly may consider as either aggravating or mitigating in determining the appropriate sentence.

Applying those standards here, we conclude that ORS 163.150(1)(a) and the jury instruction set out in ORS 163.150(1)(c)(B) (1997) do not violate the Eighth Amendment in the manner that defendant contends. As noted, ORS 163.150(1)(c)(B) (1997) requires a trial court to instruct a jury that, in deciding whether the defendant should receive the death sentence, the jury must consider "any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense" (as well as any relevant victim impact evidence). That instruction informs the jury that the jury may base its discretionary decision to impose the death sentence upon only evidence that has been presented at trial. In addition, ORS 163.150(1)(a) limits the evidence that may be admitted in a death-penalty sentencing proceeding to "evidence * * * that the court deems relevant to sentence." Under those statutes, then, a defendant may prevent a jury from considering evidence that is irrelevant or constitutionally impermissible by objecting to the admission of that evidence at trial. In addition, if a defendant is concerned that the jury might draw an improper inference from evidence introduced in relation to another issue at trial, nothing in ORS 163.150 prohibits a defendant from seeking a jury instruction that cautions against the jury's improper consideration of that evidence in determining whether to impose a death sentence.

We conclude that the trial court did not err in rejecting defendant's facial constitutional challenge to ORS 163.150(1)(a) and ORS 163.150(1)(c)(B) (1997).[14]

In addition to the argument set out above, defendant also argues that the trial court erred in overruling his demurrer because, defendant contends, ORS 163.150 does not allow meaningful judicial review of the jury's decision to impose the death sentence and because the statute does not provide comparative sentencing review. This court previously has considered and rejected those same challenges. *See Moore*, 324 Or at 429-34 (concluding that ORS 163.150(1)(b)(D) allows for meaningful judicial review of jury's decision to impose death sentence and rejecting defendant's argument that Due Process Clause requires "excessiveness" review in death-penalty cases); *State v. Cunningham*, 320 Or 47, 67-68, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995) (rejecting defendant's argument that comparative sentencing review of death sentences required under Eighth Amendment). Because we adhere to those prior rulings, and because further discussion would not benefit the public, the bench, or the bar, we decline to discuss defendant's claims.[15]

### B. *Venue*

In three assignments of error, defendant next argues that the trial court erred when it denied his pretrial motions for change of venue. Defendant first moved for change of venue in February 1999 before the start of jury selection. At a hearing before the trial court on that motion, defendant argued that there was at least a reasonable likelihood that he could not obtain a fair and impartial jury in Douglas County because of prejudicial pretrial publicity concerning the case

---

[14] We also have considered other arguments that defendant raised in this and a related assignment of error respecting the constitutionality of ORS 163.150(1)(a) and ORS 163.150(1)(c)(B) (1997). Because we conclude that those arguments are not preserved or are not well taken, we reject them without further discussion.

[15] In another assignment of error, defendant argues that the trial court erred by rejecting the other constitutional challenges to Oregon's death-penalty statute that defendant raised in his demurrer. Defendant concedes that this court previously has rejected those same challenges in other death-penalty cases. That concession is well taken, and we also decline to discuss further the challenges raised in that assignment of error. *See State v. Reyes-Camarena*, 330 Or 431, 443, 7 P3d 522 (2000) (declining to discuss such challenges because it would not benefit bench or bar in light of previous holdings); *Moore*, 324 Or at 429 n 19 (same).

and, particularly, concerning the victim Marion Carl. In support of that argument, defendant submitted copies of television news reports and newspaper articles about the case, including 41 articles from the local newspaper. The news director for the dominant local television station testified that approximately 70 percent of the local television news reports about the case primarily focused upon Marion Carl. Fourteen of the local newspaper articles also primarily focused upon facts about Marion Carl's life, his career as a celebrated Marine Corps Major General, and the local and national tributes that were being offered in his honor. The other local newspaper articles included 15 reports about the crime and the court proceedings; nine letters to the editor; two editorials; and Marion Carl's obituary. Some of the newspaper articles reported facts about defendant's criminal history. One article described Marion Carl's murder as the top local news story in 1998.

Defendant also provided the court with a survey of voters in Douglas and Multnomah counties that he had caused to be conducted approximately two months after the victim's murder. The survey purported to show that 94 percent of the polled Douglas County voters and 83 percent of the polled Multnomah County voters had recognized defendant's case; 71 percent of the polled Douglas County voters and 57 percent of the polled Multnomah County voters had believed that defendant was guilty; and 58 percent of the polled Douglas County voters and 43 percent of the polled Multnomah County voters had believed that, if found guilty, defendant should receive the death penalty.

■ Finally, defendant offered the testimony of an expert witness who opined that, based upon his analysis of the pretrial publicity and survey results, at least a reasonable likelihood existed that defendant could not obtain a fair trial in Douglas County. The expert testified that several factors created heightened prejudice against defendant in that venue, including the county's population size and Marion Carl's stature in that community.

The trial court denied defendant's motion, concluding that defendant had failed to show that he could not obtain a fair and impartial jury in Douglas County. The court agreed

that the case had generated extensive publicity, particularly in that venue. The court also agreed that some of that publicity had been "problematic," and the court speculated that "the nature of [the] status of the victim and the tremendous amount of publicity about that could well result in dislike or unfavorable prejudice toward the accused." The court, however, was not persuaded that defendant could not obtain a fair trial in Douglas County, because it also found that most of the publicity had occurred more than six months earlier, that defendant's survey was flawed, and that fewer potential jurors were likely to remember facts about the case than defendant's survey suggested.

Defendant moved for change of venue again on the fifth day of *voir dire*. In support of his renewed motion, defendant proffered additional local newspaper articles about the case and argued that a high percentage of prospective jurors had been disqualified based upon their exposure to pretrial publicity. The trial court denied defendant's motion.

Finally, defendant renewed his motion for change of venue near the close of *voir dire*. The trial court again denied that motion, stating:

> "* * * I'm convinced that we have a jury or we have a pool from which we can get a fair jury and I'm convinced of that. I'm as convinced of that as I have been in any murder case I've tried and perhaps that is somewhat surprising looking back on the amount of publicity in this case but again I think that that publicity, even though as I mentioned in my memorandum I found some of it to be—well, I'm not going to look back and recount what I said in my memorandum. I just think that we have enough jurors from here from which we could find twelve impartial, fair people to try this case."[16]

Defendant argues that, under ORS 131.355, a trial court must grant a motion for change of venue when there is a reasonable likelihood that prejudicial pretrial publicity will prevent the defendant from obtaining a fair and impartial

---

[16] In March 1999, before trial, defendant also filed a petition for an alternative writ of mandamus in this court, asking the court to require the trial judge to grant his motion for change of venue. This court denied defendant's petition.

trial in the county in which the trial is set. Defendant contends that he made such a showing in this case and that, therefore, the trial court erred by denying a change of venue. Defendant further asserts that, in deciding his motions, the trial court erred by applying an improper standard and by failing to apply "separate considerations" as to the fairness of the penalty-phase proceeding if defendant were convicted.[17] He argues that the trial court's denial of his motions for change of venue violated his right to an impartial jury under Article I, section 11, of the Oregon Constitution,[18] his right to a fair trial under the Sixth Amendment to the United States Constitution,[19] and his right to due process under the Fourteenth Amendment to the United States Constitution.[20]

■ We first note that we assume, without deciding, that the analysis for a motion for change of venue is the same under ORS 131.355 as it is under the state and federal constitutions, because defendant did not argue to the trial court that a different analysis was required and because, although his brief on review presents his arguments under separate headings as to state and federal law, defendant also does not suggest to this court how that analysis might differ. *See State v. Langley*, 314 Or 247, 259, 839 P2d 692 (1992) (assuming same analysis under statute as under state and federal constitutions for motion for change of venue). We also do not

---

[17] Defendant appears to argue that, even if he could have obtained a fair and impartial jury in the guilt phase of his trial, he could not have obtained a fair and impartial jury in the penalty phase. We agree with defendant that, in a death-penalty case, the jury's ability to be fair and impartial in any penalty-phase proceeding is an integral part of a trial court's consideration as to whether a change of venue is required. We, however, do not understand what "separate considerations" defendant thinks that a trial court must apply in making that determination.

[18] Article I, section 11, provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."

[19] The Sixth Amendment provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation * * *."

The Sixth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

[20] The Fourteenth Amendment provides, in part, that "[no state shall] deprive any person of life, liberty, or property, without due process of law[.]"

address defendant's argument that a motion for change of venue in a death-penalty case requires "separate considerations" as to the penalty-phase proceeding as opposed to the guilt-phase proceeding, because defendant did not present that argument to the trial court. *See State v. Montez*, 324 Or 343, 356, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997) (declining to consider defendant's unpreserved claim of error).

ORS 131.355 governs the standard for a motion for change of venue. That statute provides:

> "The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

Under the wording of ORS 131.355 and the decisional law of this court, a motion for change of venue is addressed to the sound discretion of the trial court. *See State v. Little*, 249 Or 297, 312, 431 P2d 810, *cert den*, 390 US 955 (1968) (stating principle); *State v. Jensen*, 209 Or 239, 253, 289 P2d 687, 296 P2d 618 (1957) (same). The trial court's discretion on such a motion, however, is not unlimited. *Little*, 249 Or at 312. When a defendant establishes that there exists such a level of prejudice against the defendant as to preclude a fair and impartial trial, then the defendant is entitled to a change of venue. *See id.* (no abuse of discretion in denying motion for change of venue when record of trial publicity did not compel conclusion that defendant could not receive fair and impartial trial); *see also Murphy v. Florida*, 421 US 794, 803, 95 S Ct 2031, 44 L Ed 2d 589 (1975) (defendant not denied fair trial when defendant failed to show that setting of trial inherently prejudicial or that jury-selection process permitted inference of actual prejudice); *Irvin v. Dowd*, 366 US 717, 728, 81 S Ct 1639, 6 L Ed 2d 751 (1961) (prejudice presumed when extremely inflammatory publicity pervaded trial and two-thirds of jurors believed defendant guilty before trial).

In exercising its discretion to determine whether prejudice against a defendant necessitates a change of venue, a trial court must evaluate the likelihood of such prejudice

from both the character and the extent of any pretrial publicity about the case; from the degree of any difficulty in obtaining impartial jurors; and from any other factor that might be indicative of prejudice against the defendant. *Langley*, 314 Or at 260-61 (considering media publicity about case and ability to obtain impartial jurors); *State v. Rogers*, 313 Or 356, 364-65, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) (same); *Jensen*, 209 Or at 254 (in determining whether trial court abused its discretion in denying motion for change of venue, this court considers any unusual difficulty in obtaining fair and impartial jury); *see also Murphy*, 421 US at 802-03 (difficulty in obtaining jurors who appear impartial relevant in evaluating those jurors' assurances of impartiality); *Rideau v. Louisiana*, 373 US 723, 727, 83 S Ct 1417, 10 L Ed 2d 663 (1963) (prejudice presumed when community where trial took place repeatedly exposed to televised "confession" by defendant). This court places great weight upon a trial court's determination that pretrial publicity was not prejudicial and that the empaneled jurors would be impartial. *Langley*, 314 Or at 261. Therefore, we will not disturb a trial court's denial of a motion for change of venue absent a determination of an abuse of discretion. *Id.* at 260.

Defendant contends that the record of prejudice in his case is comparable to that described in *Irvin*, 366 US 717. In *Irvin*, the United States Supreme Court concluded that the defendant had been denied a fair trial when the defendant's trial took place in a community that had been saturated with extremely inflammatory pretrial publicity and that had exhibited a "pattern of deep and bitter prejudice" against the defendant. *Id.* at 725-28. The publicity in that case had included news stories that the defendant had confessed to six murders and 24 burglaries, as well as stories that had detailed the defendant's background and criminal history. *Id.* at 725-26. The local news stations also had broadcasted the results of interviews with different community members as to their opinions about the defendant's guilt and the punishment that he should receive. *Id.* at 725. In addition, two-thirds of the jurors who actually had served in the defendant's case professed to having formed opinions as to the defendant's guilt before the start of the trial. *Id.* at 728.

Our review of the record here reveals a sharp contrast to the above-described record of prejudice against the defendant in *Irvin*. It is clear from the publicity that surrounded defendant's case, and particularly from the publicity that took place in Douglas County, that the murder of Marion Carl was widely publicized and that his death was a source of sorrow and profound loss for many. However, although that publicity certainly included some expressions of anger at Marion Carl's murder, the record of publicity does not disclose a community sentiment of "deep and bitter prejudice" against defendant.

In addition, we observe that the trial court here considered the possibility of prejudice against defendant based upon pretrial publicity concerning the case and the life of Marion Carl. The court presided over a lengthy jury selection process that included both an extensive juror questionnaire and seven days of *voir dire* questioning. In addition, as described more fully in the discussion of the next assignment of error, near the close of *voir dire*, the trial court also provided defendant with a second opportunity to challenge any of the prospective jurors who already had been passed for cause. Defendant took that opportunity, but challenged only one prospective juror, and the trial court allowed that challenge. Of the 12 jurors who actually served in defendant's trial, 10 disclosed that they had seen some form of pretrial media publicity concerning the case. However, none of the jurors had followed that publicity with much interest, and all the jurors stated that they could decide the case based solely upon the evidence presented at trial.

Based upon that record, we cannot say that the trial court erred in concluding that there did not exist such a level of prejudice against defendant so as to preclude a fair and impartial trial. We therefore find no abuse of discretion in the trial court's decision to deny defendant's motions for change of venue.

C. *Failure to Excuse Juror for Cause*

 Defendant also assigns error to the trial court's denial of his challenge for cause against juror Ocumpaugh. In response to questions on the juror questionnaire and to defense counsel's initial questions during *voir dire*,

Ocumpaugh disclosed that she was familiar with defendant's case from pretrial publicity in the media. She stated that she believed that defendant probably was guilty, that she would require defendant to prove his innocence, and that she believed that the death penalty was appropriate for murder. Based upon her statements, defendant challenged her for cause.

The prosecutor then asked permission to inquire. He explained to Ocumpaugh that, as a juror, she would be required to take an oath to base her decision as to defendant's guilt upon only the evidence presented at the trial and to require the state to prove the charges beyond a reasonable doubt. Ocumpaugh replied that she was willing to and would be able to comply with that oath.

The trial court questioned Ocumpaugh further. Ocumpaugh confirmed that she understood that defendant was presumed innocent, that the state had the burden to prove the charges beyond a reasonable doubt, and that, as a juror, she would be required to base her decision as to defendant's guilt upon only the evidence presented at trial. She also volunteered that she knew from her own personal experience that facts reported in the media were not always accurate. The trial court then asked Ocumpaugh to assess honestly whether she had formed such a fixed opinion as to defendant's guilt that she would not be able to judge defendant fairly. Ocumpaugh denied that she had formed such an opinion, and the trial court overruled defendant's challenge.

After that exchange, defense counsel resumed his questioning of Ocumpaugh. In response to his questions, Ocumpaugh initially stated that she believed that defendant had the burden to show that he should receive a life sentence rather than the death penalty, but then she professed that she did not understand defense counsel's questions. After defense counsel clarified that he was asking if Ocumpaugh would require defendant to produce evidence to "get a favorable result," Ocumpaugh stated that she would require defendant to produce such evidence only if the state had met its burden. Defendant renewed his challenge to Ocumpaugh for cause, but the trial court overruled that challenge.

Subsequently, on the sixth day of *voir dire*, the trial court announced that he would entertain any challenges that the parties wished to raise to prospective jurors who already had been passed for cause. The next day, defense counsel raised the trial judge's invitation to renew challenges, and he asked the court to reconsider his challenge for cause to prospective juror Cole. The trial judge asked defense counsel if he had any other challenges that he wished the court to reconsider, and defense counsel responded that "[t]hat's the only one that comes strongly to mind." The trial court allowed defendant's challenge for cause to prospective juror Cole. Juror Ocumpaugh was not excused.

On review, defendant contends that Ocumpaugh's answers on the juror questionnaire and during *voir dire* reveal that she was "both guilt biased and death biased." He further asserts that the trial court should have excused Ocumpaugh based upon a statement that she believed that defendant was involved with illegal drugs. Defendant argues that the trial court's failure to excuse Ocumpaugh violated his right to an impartial jury under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution, as well as the Due Process Clause of the Fourteenth Amendment.[21]

The state responds that defendant waived his challenge to Ocumpaugh because he did not renew that challenge after the trial court allowed the parties to renew challenges to prospective jurors who had been passed for cause. On the merits, the state argues that, as a whole, Ocumpaugh's statements demonstrated that she would be a fair and impartial juror.

■ At the outset, we reject the state's contention that, because he did not renew his challenge to juror Ocumpaugh, defendant waived that challenge. Waiver is the "intentional

---

[21] Defendant does not contend that, in this context, the Oregon constitutional guarantee to an impartial jury differs from that of the United States Constitution. *See Compton*, 333 Or at 285 n 6 (considering state and federal constitutional claims together in context of motion to exclude jurors for cause in absence of argument to contrary); *State v. Barone*, 328 Or 68, 71 n 2, 969 P2d 1031 (1998), *cert den*, 528 US 1086 (2000) (same).

relinquishment or abandonment of a known right or privilege." *State v. Meyrick*, 313 Or 125, 132, 831 P2d 666 (1992). In this case, although the trial court offered to consider renewed challenges to prospective jurors who had been passed for cause, the trial court did not suggest that defendant was required to take advantage of that offer to avoid abandonment of his previously denied challenges. Further, in declining the trial court's offer to consider other renewed challenges, defense counsel did not indicate that he had abandoned his previously denied challenges, but only that he most strongly objected to prospective juror Cole. That record does not demonstrate that defendant's decision not to renew his challenge to Ocumpaugh evidenced an intent to abandon that challenge. Defendant preserved his objection to Ocumpaugh by challenging her twice during *voir dire*, and his decision not to repeat his objection did not constitute a waiver of those challenges.

▮▮▮▮ We turn to the merits of defendant's claim that the trial court should have excused juror Ocumpaugh for actual bias. ORCP 57 D(1)(g) governs challenges for cause to prospective jurors for actual bias. *See* ORS 136.210(1); *see also State v. Barone*, 328 Or 68, 74, 969 P2d 1013 (1998), *cert den*, 528 US 1086 (2000) (so stating). Under ORCP 57 D(1)(g), the fact that a prospective juror has formed opinions about matters relevant to the case is not itself cause to exclude that juror based upon actual bias. *See also Barone*, 328 Or at 74 (so stating). Instead, in determining whether a prospective juror should be excused for actual bias, "the test is whether the prospective juror's ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." *Barone*, 328 Or at 74. Whether a prospective juror is actually biased is a factual question to be determined by the trial court as an exercise of its discretion. ORCP 57 D(1)(g); *see State v. Lotches*, 331 Or 455, 473, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (so stating). Because the trial court has the advantage of observing the demeanor, apparent intelligence, and candor of a challenged prospective juror, a trial court's discretionary decision on such a challenge is entitled to deference and will not be disturbed absent a manifest abuse of discretion. *Compton*, 333 Or at 285.

As noted, the challenged juror here, Ocumpaugh, initially stated that she had formed opinions relating to defendant and to defendant's guilt from pretrial publicity about the case. She also initially stated that she would require defendant to prove his innocence. However, after the prosecutor explained the legal duties of a juror to her, Ocumpaugh was unequivocal that she was willing and would be able to require the state to prove defendant's guilt beyond a reasonable doubt and to base her decision upon only the evidence presented at trial. In addition, although she expressed support for the death penalty in general, Ocumpaugh consistently denied that she automatically would vote for the death penalty in all circumstances or in this particular case. She also assured the trial court that she had not formed strong opinions about the case, and the court, which had the opportunity to observe her demeanor, was persuaded that she would be able to perform her duties as a juror fairly and impartially. Because evidence in the record supports that determination, we find no abuse of discretion in the trial court's refusal to excuse juror Ocumpaugh for cause.

## III. GUILT-PHASE ASSIGNMENT OF ERROR

Defendant next argues that the trial court erred by failing to issue a curative instruction or to declare a mistrial *sua sponte* because of statements that the prosecutor made during his closing argument.

The prosecutor began his closing argument by outlining facts incorporated in defendant's version of events that, if true, would have tended to show that defendant had not shot Marion Carl or Edna Carl intentionally or with the intent to kill. The prosecutor then stated:

> "*So if the defense were able to persuade you of all of these things, all we'd be left with is robbery and burglary, not any murder charges, no attempted murder charges, zilch. He's off the hook.* If he's unable to establish any of those things and I am able to prove what I'm about to prove to you, then he's stuck with all of them and you'll find him guilty of all of them."

(Emphasis added.)

Defendant made no objection to the prosecutor's arguments at trial. Instead, in his closing argument, defense counsel responded:

"Well, ladies and gentlemen, I hate to disappoint [the prosecutor] but his attempt to co-op my argument was a little off the mark. I'm going to tell you exactly what Jesse Fanus is guilty of and why.

"He's guilty of count four, felony murder.

"He's guilty of count nine, robbery in the first degree.

"He's guilty of count ten, assault in the second degree.

"He's guilty of count eleven, burglary in the first degree.

"And counts twelve and thirteen, D & D Towing.

"Those are what he's guilty of. You heard evidence that would lead you to believe that.

"What he's not guilty of is aggravated murder or attempted aggravated murder, either one."

On review, defendant contends that the prosecutor's arguments denied him a fair trial because the prosecutor improperly suggested that the jury faced an all-or-nothing choice between guilt or acquittal as to all the murder counts. Defendant concedes that, because he took no action in response to the prosecutor's statements at trial, he did not preserve this assignment of error. He urges, however, that this court consider this claim of error as "error apparent on the face of the record[.]" ORAP 5.45(6); *see State v. Reyes-Camarena*, 330 Or 431, 435-36, 7 P3d 522 (2000) (explaining and applying plain error doctrine).

The state responds that, viewed in context, the prosecutor's statements were neither misleading nor improper because those statements in fact referred to only the intentional murder counts. The state also argues that, even if improper, the prosecutor's statements could not have misled the jury in this case because both the prosecutor and defense counsel subsequently argued to the jury that felony murder did not require a finding of intent, and because the trial court instructed the jury on the elements of each crime that the state had charged, including the elements of felony murder.

It is not apparent from our review of the record that, as the state contends, the prosecutor's statements referred to only the intentional murder counts. Even assuming that the prosecutor's arguments misstated the law, however, we nevertheless conclude that the trial court's failure to issue a curative instruction or to declare a mistrial *sua sponte* on the basis of those arguments does not amount to an "error apparent on the face of the record."

This court consistently has held that a motion for a mistrial is addressed to the sound discretion of the trial court because the trial court is in the best position to assess and rectify any potential prejudice to the defendant. *State v. Farrar*, 309 Or 132, 164, 786 P2d 161, *cert den*, 498 US 879 (1990) (so stating); *see also State v. Simonsen*, 329 Or 288, 300, 986 P2d 566 (1999), *cert den*, 528 US 1090 (2000) (same). Thus, even if the court finds that a prosecutor's statements were improper, this court will not find that a trial court's failure to grant a mistrial *sua sponte* constituted error apparent on the face of the record unless it was "beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial." *Montez*, 324 Or at 357 (so stating); *see also State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990) (even if this court finds prosecutor's remarks "improper, tasteless, or inappropriate," no abuse of discretion in trial court's denial of motion for mistrial unless effect of remarks was to deny defendant fair trial).

In the present case, the prosecutor's alleged misstatement was isolated and later was corrected by the prosecutor's closing argument, the defense counsel's closing argument, and the trial court's jury instructions defining the elements of each crime charged. Viewed in that context, the prosecutor's argument was not so prejudicial that the trial court's failure to issue a curative instruction or to declare a mistrial *sua sponte* can be said to have denied defendant a fair trial. We find no error.

## IV. PENALTY-PHASE ASSIGNMENTS OF ERROR

### A. *Failure to Exclude Evidence of Defendant's Nazi Beliefs*

Defendant assigns error to the trial court's ruling that permitted the state to introduce certain evidence that

related to defendant's beliefs in white supremacy and Nazi ideology. Before the penalty-phase proceeding began, defense counsel filed a motion *in limine* to exclude "any evidence relating to defendant's belief or expressions of belief in racist ideals, white supremacy or other matters of similar nature or defendant's use or display of symbols of such belief." In response to defendant's motion, the state submitted a list of the evidence that it sought to introduce during the penalty-phase proceeding that related to defendant's racist beliefs. The state asserted that its proffered evidence was relevant to the jury's determination of defendant's future dangerousness, ORS 163.150(1)(b)(B), as well as to the jury's determination whether defendant should receive the death sentence, ORS 163.150(1)(b)(D). The trial court ruled that some of the state's evidence was relevant to the issue of defendant's future dangerousness, but that the admissibility of other items of evidence would depend upon the context in which the state offered it.

During the penalty-phase proceeding, the state introduced the testimony of Goodman and Flory, both employees of MacLaren Youth Correctional Facility, that defendant had contributed to racial tensions, had made racist remarks to and provoked a fight with a minority youth, and had committed acts of racist graffiti while defendant had been in custody at MacLaren in 1995 and 1996. The state also offered the testimony of Douglas County Detective Perkins that defendant had confessed to spray-painting swastikas, the letters "SS," and the words "Juden Frei"[22] on a shack on the night of Marion Carl's murder. The state later introduced photographs of that shack as exhibits, showing graffiti that included a swastika, the letters "SS," and the words "Death to All Jews" and "Fuck Niggers and Jews." In addition, the state introduced testimony that defendant had scratched graffiti, including a swastika symbol and the letters "SS," in his jail cell after his arrest for the crimes in this case.

Over defendant's objection, the state also introduced five exhibits that consisted of writings by defendant. In the disputed exhibits, defendant had expressed a hatred of

---

[22] Detective Perkins testified that defendant had told him that defendant understood "Juden Frei" to mean "cleanse the Jews" in German.

minorities, as well as beliefs in white supremacy and Nazi ideology.[23]

In this court, defendant challenges only the admissibility of the five disputed exhibits consisting of defendant's writings. He argues that those exhibits were irrelevant under OEC 401[24] as to any of the four statutory questions set out in ORS 136.150(1)(b) and were unfairly prejudicial under OEC 403.[25] Citing *Dawson*, 503 US 159, defendant also asserts that the introduction of the challenged exhibits violated his right to free speech under the First Amendment to the United States Constitution.[26] We address defendant's subconstitutional arguments before addressing his federal constitutional claim.[27]

---

[23] The challenged exhibits included: (1) a drawing of a swastika with the words "Aryan Pride" and "Third Reich" written around it, and, among other things, various racial epithets followed by the words "live in fear cause the end is near"; (2) a writing titled "Pink Floyd" that referred to homosexuals, a Jewish person, and "rif raf," and ended with the statement, apparently a lyric from a song by the band Pink Floyd, "if I had my way, I'd have them all shot"; (3) a poem titled "Juden Frei" that included lines such as "I wish I could kill a Jew" and "If I had my way I would have there [*sic*] bodies laying everywhere"; (4) another writing titled "Juden Frei"; and (5) a copy of a "Pee-Chee" folder with the words "ouch," "rape." "let's hurry up and catch that Jew," and "help" written on it.

[24] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[25] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The state argues that defendant did not preserve adequately his argument that the disputed exhibits were unfairly prejudicial under OEC 403. After reviewing the record, we conclude that defendant adequately preserved that claim of error.

[26] The First Amendment provides, in part, that "Congress shall make no law * * * abridging the freedom of speech * * *." The First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *New York Times v. Sullivan*, 376 US 254, 264 n 4, 84 S Ct 710, 11 L Ed 2d 686 (1964).

[27] On review, defendant also contends that the admission of the disputed evidence violated his right to due process under the Fourteenth Amendment. However, although defendant cited the Fourteenth Amendment in his motion *in limine*, defendant made no objection to the trial court upon due process grounds. Thus, defendant failed to preserve his due process argument, and we do not address it. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (to preserve issue for appellate

This court reviews a trial court's determination of relevance for errors of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). To be relevant to the issue of a defendant's future dangerousness under ORS 136.150(1)(b)(B), "the proffered evidence must have a tendency to show that a probability either does or does not exist that the defendant will commit criminal acts of violence that would constitute a continuing threat to society." *Moore*, 324 Or at 417. This court repeatedly has held that a broad range of evidence is admissible to make that showing, including a defendant's entire prior criminal history, unadjudicated bad acts by a defendant, and evidence of a defendant's previous bad character. *Id.* at 416; *see also State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990) (evidence of defendant's prior conduct, good and bad, is relevant to question of defendant's future dangerousness).

In *Moore*, this court considered whether evidence of the defendant's beliefs in white supremacy was relevant to the question of the defendant's future dangerousness. The court concluded that, although evidence of a defendant's abstract beliefs or expression of beliefs generally is irrelevant to the issue of future dangerousness, such evidence is relevant when the state also introduces evidence of past dangerous conduct by the defendant that was predicated upon those beliefs. *Moore*, 324 Or at 418-19. The court reasoned that, in such circumstances, evidence relating to the defendant's beliefs is probative of the defendant's propensity to act dangerously in the future because it demonstrates the depth of the defendant's adherence to beliefs that drove the defendant to act dangerously in the past. *Id.* at 419.

That same reasoning applies here. As in *Moore*, the state did not introduce only evidence that defendant previously had expressed feelings of racial hatred and beliefs in Nazi ideology; rather, the state also introduced evidence, which defendant does not challenge on review, that demonstrated that defendant previously had engaged in criminal conduct—including assaultive conduct and acts of graffiti—

---

consideration, party must object with sufficient clarity to allow trial court to consider alleged error).

related to those beliefs. Under those circumstances, defendant's expressions of his racist beliefs were probative of his propensity to act dangerously in the future and, thus, were relevant to the jury's determination under ORS 163.150(1)(b)(B).[28]

In this case, we also fail to see any danger of unfair prejudice to defendant from the admission of the disputed exhibits. *See* OEC 403 (relevant evidence may be excluded if probative value substantially outweighed by danger of unfair prejudice). As noted, in addition to those exhibits, the jury also heard substantial evidence of defendant's racist beliefs from other testimony and exhibits that the state presented during the penalty-phase proceeding that defendant does not challenge on review. We find no abuse of discretion in the trial court's decision that the disputed exhibits were not prejudicial and, therefore, no error. *See State v. Rose*, 311 Or 274, 290-91, 810 P2d 839 (1991) (court reviews trial court's ruling under OEC 403 for abuse of discretion).

Finally, we reject defendant's assertion that the admission of the disputed exhibits violated his right to free speech under the First Amendment. As this court explained in *Moore*, the admission of evidence relating to a defendant's beliefs or expression of beliefs does not violate the First Amendment when that evidence is relevant to the jury's determination of an issue in the proceeding. *Moore*, 324 Or at 422; *see also Dawson*, 503 US at 166-68 (evidence of defendant's membership in Aryan Brotherhood violated defendant's First Amendment rights, because evidence not relevant to any issue being decided in proceeding). Because, as we determined above, the evidence at issue here was relevant to the jury's determination under ORS 163.150(1)(b)(B), the admission of that evidence did not violate defendant's First Amendment rights.

---

[28] Because we determine that the disputed exhibits were relevant to the jury's determination under ORS 163.150(1)(b)(B), we do not need to address the state's contention that those exhibits were relevant under ORS 163.150(1)(b)(D). *See Moore*, 324 Or at 414 (declining to consider whether disputed evidence would be admissible under ORS 163.150(1)(b)(D) in light of determination that evidence was relevant under ORS 163.150(1)(b)(B)).

## B. *Sufficiency of the Indictment*

In two assignments of error, defendant contends that the trial court's imposition of the death sentence was unconstitutional because, according to defendant, the indictment did not allege an offense that made him eligible for the death penalty. Defendant's arguments are not preserved and, in any event, were resolved against him in *State v. Oatney*, 335 Or 276, 292-97, 66 P3d 475 (2003).

## V. CONCLUSION

In summary, we conclude that none of defendant's assignments of error is well taken, and, consequently, we affirm defendant's convictions and the sentence of death.

The judgment of conviction and the sentence of death are affirmed.