Argued and submitted September 8, 2003, judgment of conviction and sentence of death affirmed January 23, reconsideration denied March 23, 2004

STATE OF OREGON,
*Respondent,*

*v.*

JEFFERY DANA SPARKS,
*Appellant.*

(CR98326; SC S46773)

83 P3d 304

Dan Maloney, Deputy Public Defender, Salem, argued the cause and submitted the brief for appellant. With him on the opening brief was David E. Groom, State Public Defender, and on the reply brief was Peter A. Ozanne, Executive Director.

Kathleen Cegla, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Robert B. Rocklin, and Steven R. Powers, Assistant Attorneys General.

DURHAM, J.

**DURHAM, J.**

This case is before the court on automatic and direct review of defendant's judgment of conviction and sentence of death. *Former* ORS 163.150(1)(g) (1997), *repealed by* Or Laws 1999, ch 1055, § 1; ORAP 12.10(1).[1] On review, defendant asks this court to reverse his convictions for 15 counts of aggravated murder, or, in the alternative, to vacate his sentence of death and remand the case for resentencing. For the reasons set out below, we affirm defendant's convictions and the sentence of death.

Because the jury found defendant guilty, we review the evidence in the light most favorable to the state. *State v. Thompson*, 328 Or 248, 250, 971 P2d 879, *cert den*, 527 US 1042 (1999).

On April 20, 1998, the victim, who was 12 years old, left her home on her bicycle. At about 6:00 p.m. the victim's mother and her friend, Blake, saw the victim with some friends near the local post office. Defendant also was present. After speaking with her mother, the victim returned home for a short time and then left again to retrieve her bicycle, which had a flat tire. At about 8:30 p.m., the victim's grandmother saw the victim walking her bicycle with a man with long dark hair similar to defendant's hair.

That night, according to Keith, defendant and the victim entered the trailer where Keith and defendant lived. Defendant took the victim into the back bedroom and told Keith that he was "not home." An hour later, defendant came out of the bedroom and told Keith to go buy him condoms and a douche. Defendant had a cut on the right side of his face that had not been there before. Keith also heard what sounded like sexual sounds coming from the back bedroom.

At some point that night, Keith saw the victim come out of the bedroom and go into the bathroom. Defendant followed her into the bathroom and Keith heard water running. At about 12:30 a.m., defendant told Keith that he was taking the victim home, and left with her. Defendant returned alone

---

[1] ORS 138.012 now provides for this court's automatic and direct review of a judgment of conviction and sentence of death.

about an hour later and seemed agitated. Defendant left again at 3:00 a.m. and returned at 6:00 a.m.

Rodriguez, an acquaintance of defendant, saw defendant at approximately 4:00 a.m. walking from the park or the railroad tracks. Defendant was wearing a black trenchcoat and a black stocking hat. When Rodriguez saw defendant again at 5:30 a.m., he was not wearing the coat or hat, and appeared to be nervous and sweating.

The victim did not return home. Throughout the night, the victim's mother and Blake drove around and visited the victim's friends in attempt to locate her.

On the morning of April 21, 1998, while operating a train, an engineer observed what appeared to be a sleeping transient on the side of the railroad embankment. He called his dispatcher, who then notified the Yamhill County Sheriff's Office. The police responded to the call and discovered the partially nude body of the victim. Someone had strangled her both manually and by ligature. There was a small bruise to the entrance of her vagina consistent with sexual assault. Swabs of the victim's body were negative for the presence of semen and defendant's DNA. However, police found a Band-Aid near the victim's body that contained DNA that was consistent with defendant's DNA and that could not have come from the victim. .

On the morning of April 21, defendant told Keith to clean the trailer because the police would be searching it. Keith burned drug paraphernalia behind the trailer, and defendant also may have burned some items. Defendant told Keith not to tell the police that he had left at 3:00 a.m. After the police interviewed Keith on April 22, defendant tried to convince Keith that the victim had not been at the trailer and he threatened to kill Keith if he caused any problems.

On April 21, Detectives Runyon and Crabtree interviewed defendant. Defendant had a fresh scratch on the right side of his face, fresh scratches on his arm, and bruising around his biceps. During the interview, defendant repeatedly changed his story. After initially denying that he knew the victim or had had any contact with her, defendant admitted to meeting her once on April 20 in front of the market.

Runyon, Crabtree, and Detective Ludwig interviewed defendant a second time on April 23. They confronted defendant with the information that Keith had provided. Defendant admitted that he was with the victim in his bedroom and had fondled her buttocks, breasts, and vagina. However, defendant denied having sex with her.

The state charged defendant with 15 counts of aggravated murder, ORS 163.095; one count of first-degree sexual abuse, ORS 163.427; one count of first-degree kidnaping, ORS 163.235; one count of second-degree kidnaping, ORS 163.225; one count of first-degree attempted rape, ORS 163.375 and ORS 161.405; and one count of second-degree attempted rape, ORS 163.365 and ORS 161.405.

The jury found defendant guilty of all 20 counts in the indictment.[2] In a separate sentencing proceeding on the counts of aggravated murder, the jury determined that defendant had acted deliberately, that defendant posed a continuing risk to society, and that defendant should receive a death sentence.[3] The trial court then entered a sentence of death.

---

[2] The trial court merged the convictions on counts 16 through 20—the underlying felonies of first-degree sex abuse, first- and second-degree kidnaping, and first- and second-degree attempted rape—with the aggravated murder convictions.

[3] Oregon law requires the court, in a death-penalty sentencing proceeding, to submit the following four questions to the jury after the presentation of the evidence:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

ORS 163.150(1)(b). The jury considers the third question set out in paragraph (b)(C), regarding provocation by the victim, only when that question is relevant under the facts of the case. See State v. Terry, 333 Or 163, 182-83 n 12, 37 P3d 157 (2001), cert den, 536 US 910 (2002) (question set out in ORS 163.150(1)(b)(C) not submitted to jury). In this case, the parties stipulated that the facts did not raise the issue of provocation by the victim and, thus, the jury did not consider the third question.

On review, defendant raises 33 assignments of error, most of which are not well taken and do not require separate discussion. We analyze defendant's remaining arguments in the order that he presents them: pretrial issues, guilt-phase issues, and penalty-phase issues.

### I. ASSIGNMENTS OF ERROR REGARDING PRETRIAL ISSUES

Defendant raises 13 assignments of error that pertain to his pretrial motions and jury *voir dire*. Seven of those assignments raise facial challenges to the constitutionality of Oregon's death-penalty statute. This court previously has considered and rejected defendant's constitutional challenges to the statute.[4] Another assignment of error presents a challenge to the constitutionality of excluding convicted felons and nonregistered voters from the jury pool. This court previously has considered and rejected that challenge. We adhere to those prior rulings and, because further discussion would not benefit the public, bench, or bar, we decline to address those assignments of error in detail.

In three assignments of error, defendant argues that the trial court erred in overruling his objections and in refusing to grant a mistrial on the basis of questions and statements that the prosecutor presented to prospective jurors during *voir dire*. On review, we conclude that, in the context of this case, the trial court's rulings do not reflect an abuse of discretion. A detailed discussion of our reasons for reaching that conclusion would not serve the interests of the public, bench, or bar. However, two issues that defendant raises in two assignments of error regarding pretrial matters warrant further discussion.

A. *Venue*

■ We first address defendant's argument that the trial court erred in denying his motion for a change of venue. ORS

---

[4] Defendant also raises two supplemental assignments of error, in which he attacks the facial constitutionality of the future dangerousness question, set out in ORS 163.150(1)(b)(B), and its accompanying jury instruction. Because defendant did not preserve those arguments and they do not qualify as error apparent on the face of the record, we do not address them.

131.355 provides the standard for a motion for change of venue:

"The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

Defendant argues that prejudicial pretrial publicity made it impossible for him to receive a fair trial in Yamhill County and that holding the trial in that venue violated his rights under ORS 131.355 and under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.[5] Defendant has not offered a different analysis under the statute than under the state or federal constitutions. In construing the meaning and application of Oregon's statute and state constitution in this context, we consider and give due weight to federal court interpretations of federal law on the same subject based on the pertinence and persuasiveness of the reasoning offered. We review a trial court's denial of a motion for change of venue for an abuse of discretion.

In this case, defendant moved for a change of venue before the start of jury selection. He argued that the pretrial publicity detailing his personal history, his criminal record, and the effect of the murder on Yamhill County communities had made it impossible for him to receive a fair and impartial trial in Yamhill County. In support of that motion, defendant submitted copies of four newspaper articles published about the case and provided the court with an opinion poll of 250 Yamhill County residents taken within one month of the victim's murder. That poll purported to show that 75 percent of

---

[5] Article I, section 11, provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *." The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *." The Sixth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

residents recalled hearing about a case in which the authorities had accused defendant of raping and murdering a 12-year-old girl and, of those residents, 51 percent had an opinion that defendant was guilty, and 54 percent had an opinion that, if defendant was found guilty after a fair trial, he should receive the death penalty.

The trial court denied defendant's motion. The court determined that the views shown by the poll, although somewhat useful, were "given in response to fairly general questions and do not appear to the [c]ourt to be so fixed as to foreclose a fair consideration of all the evidence in the case." The court concluded that the jury selection process would provide a sufficient safeguard to ensure that defendant obtained a fair and impartial jury. Defendant did not renew his motion for change of venue.

On review, defendant asserts that he was entitled to a change of venue because the opinion poll demonstrated that there was a "reasonable likelihood that pretrial publicity w[ould] prevent defendant from obtaining a fair trial."[6] However, the applicable standard is not whether there is a "reasonable likelihood" that defendant cannot obtain a fair trial. Rather, under ORS 131.355, the standard is whether

> "the court is satisfied that there exists * * * so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

Here, the trial court reviewed the newspaper articles and the opinion poll that defendant submitted, and concluded that defendant had not demonstrated that the residents of Yamhill County had such a fixed opinion about the case that defendant could not obtain a fair trial.

We recently addressed similar arguments raised by the defendant in *State v. Fanus*, 336 Or 63, 79 P3d 847

---

[6] Defendant also asserts that the trial court erred by failing to apply different considerations in determining whether he could obtain a fair penalty-phase proceeding if he were convicted. However, we decline to address that argument, because defendant did not present it to the trial court. *See State v. Fanus*, 336 Or 63, 77-78, 79 P3d 847 (2003) (declining to address same argument because the defendant had not presented it below).

(2003). In that case, the defendant submitted several television news reports and newspaper articles, including 41 articles from the local newspaper. He also submitted an opinion poll that purported to show that, in the county where the state would try him, 94 percent of voters recognized his case, 71 percent believed that he was guilty, and 58 percent believed that, if found guilty, he should receive the death penalty. *Id.* at 75. At the hearing on his motion for change of venue, the defendant also submitted expert testimony that "several factors created heightened prejudice against [the] defendant in that venue[.]" *Id.* The defendant renewed his motion during, and at the close of, jury *voir dire*. This court concluded that the trial court had not abused its discretion in denying those motions. In doing so, this court explained that, in contrast to *Irvin v. Dowd*, 366 US 717, 81 S Ct 1639, 6 L Ed 2d 751 (1961), "the record of publicity d[id] not disclose a community sentiment of 'deep and bitter prejudice' against [the] defendant." *Fanus*, 336 Or at 80.

In this case, defendant does not claim, nor do we conclude, that the pretrial publicity here was comparable to the inflammatory publicity that denied the defendant a fair trial in *Irvin v. Dowd*. Further, defendant did not present evidence that the denial of his motion for a change of venue caused him to be unable to obtain an impartial jury or that he actually was deprived of a fair and impartial jury. To the contrary, the trial court presided over a lengthy jury selection process that included an extensive juror questionnaire and three days of individual *voir dire* questioning. Of the 13 jurors that actually served,[7] six disclosed that they either had seen some form of pretrial publicity about the case or had talked to a friend or family member who had seen publicity about the case. However, none of those jurors could remember details about that publicity and each stated that he or she could decide the case based solely on the evidence presented at trial.

We conclude that the trial court did not abuse its discretion in denying defendant's motion for change of venue.

---

[7] The court excused one juror after the guilt phase of defendant's trial and replaced that juror with the first alternate juror in the penalty phase.

## B. *Post-Mortem Photographs*

■ In another assignment of error, defendant argues
that the trial court erred in denying his supplementary
motion *in limine* to exclude post-mortem photographs of the
victim and portions of the videotape of the crime scene that
depicted the victim's body. Defendant argues that, because
he had offered to stipulate to the facts that the photographs
would tend to show as true, the photographs were inadmis-
sible as irrelevant and unfairly prejudicial.[8] After a hearing,
the trial court denied defendant's motion.[9]

**5, 6.** We first address defendant's argument that, in light
of his offered stipulation, the post-mortem photographs were
irrelevant to any material issue in the case. OEC 401 pro-
vides:

> " 'Relevant evidence' means evidence having any ten-
> dency to make the existence of any fact that is of conse-
> quence to the determination of the action more probable or
> less probable than it would be without the evidence."

OEC 401 establishes a "very low threshold" for the admission
of evidence, that is, "evidence is relevant so long as it
increases or decreases, even slightly, the probability of the
existence of a fact that is of consequence to the determination
of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5
(1999), *cert den*, 528 US 1086 (2000). We review a trial court's

---

[8] In his motion, defendant offered to stipulate (1) that whoever killed the vic-
tim "did so intentionally, first by manual strangulation and then with a belt
belonging to her mother"; (2) that the victim was found lying face down near the
railroad tracks; (3) that the victim was partially nude and her shorts were found on
the embankment of the railroad tracks; (4) that somebody had cut or torn the vic-
tim's shorts off her body; (5) that a Band-Aid containing blood on the gauze pad was
found near the victim's body; and (6) that the victim's bicycle was found down the
railroad track embankment a short distance from the victim's body. At the hearing
on defendant's motion, defendant further offered to stipulate (1) that "somebody
intended to sexually abuse and rape [the victim]"; (2) that "somebody intended to
physically harm [the victim]"; (3) that "somebody attempted to conceal the body,
the commission of the crimes, and the identity of the individual"; and (4) that the
victim "was nude from the waist down and that the clothing on her upper body had
[been] forced upwards * * * to expose her breasts."

[9] During the trial, defendant objected to the admission of several photographs
based on his motion *in limine*. The trial court overruled all but two of those objec-
tions, determining that those two photographs were needlessly cumulative. Defen-
dant has not assigned error to those rulings.

determination of relevance under OEC 401 for errors of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999).

We first note that, without the stipulation, the photographs of the victim's body were relevant. The state sought to admit the photographs to illustrate the testimony of several witnesses, to prove the nature and circumstances of the victim's death, and to prove that defendant had acted intentionally. Defendant asserts, however, that the photographs became irrelevant once he offered to stipulate to the facts that the state sought to prove with the photographs. Defendant's argument is not well taken. His proposed stipulation only provides an alternate form of proof. It did not have the effect of making otherwise relevant evidence irrelevant. Laird C. Kirkpatrick, *Oregon Evidence* § 401.02, Art IV-4 (4th ed 2002) (quoting 1981 Conference Committee to OEC 401) addresses that point:

> " 'The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of * * * considerations [set forth in] Rule 403, rather than under any general requirement that evidence is admissible only if directed to matters in dispute.' "

We conclude that the mere availability of defendant's offered stipulation as an alternate form of proof did not render the photographs irrelevant.

We next turn to defendant's argument that the trial court should have excluded the photographs because, in light of his offered stipulation, they were unfairly prejudicial. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

"In the context of OEC 403, 'unfair prejudice' means 'an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one.' " *State v. Moore*, 324 Or 396, 407-08, 927 P2d 1073 (1996). We review a

trial court's decision under OEC 403 for an abuse of discretion. *Id.* at 407.

Defendant argues that the photographs depicting the victim's body were unfairly prejudicial because they had a tendency to "evok[e] a visceral, emotional response" from the jurors. Defendant further argues that, because his offered stipulation covered the facts that the state sought to prove with the photographs, the court should have excluded them.

In support of his argument, defendant relies on *Old Chief v. United States*, 519 US 172, 117 S Ct 644, 136 L Ed 2d 574 (1997); *State v. Zimmerlee*, 261 Or 49, 492 P2d 795 (1972); and *State v. McKendall*, 36 Or App 187, 584 P2d 316 (1978), *overruled on other grounds by State v. Lopez*, 147 Or App 314, 936 P2d 386 (1997). In particular, defendant points to the following statement that the Court of Appeals made in *McKendall*:

> "[W]hen a defendant offers to stipulate to a fact, proof of the fact would be prejudicial to the defendant, and the evidence offered in proof is not probative of any issue other than that which the stipulation addresses, the evidence is inadmissible."

*McKendall*, 36 Or App at 198. However, as we explain below, defendant's reliance on those cases is misplaced.

In *McKendall*, the authorities charged the defendant with murder under an accomplice theory. At trial, the defendant sought to exclude photographs of the murder victim's body by stipulating that someone had murdered the victim. The court determined that, other than the fact that someone had murdered the victim, photographic evidence of the murder victim's body was irrelevant to the issues in the case. Because the defendant's stipulation covered that fact and because the photographic evidence of the victim's murder would be unfairly prejudicial to the defendant, the court concluded that the trial court should have excluded the evidence. *Id.* at 197-98. In reaching that conclusion, the Court of Appeals relied on this court's decision in *Zimmerlee*.

In *Zimmerlee*, the state charged the defendant with armed robbery of Palmer. In the course of the robbery, the

defendant had pointed a pistol at Palmer. Later the same evening, the defendant had pointed a pistol at Charley before provoking a fight with him. The defendant sought to exclude evidence of his encounter with Charley by stipulating to the fact that he was in possession of the pistol when he first pursued Charley. This court determined that "evidence of [the] defendant's encounter with Charley was relevant to the issue of [the] defendant's possession of the gun at the time of the robbery." *Zimmerlee*, 261 Or at 53. However, the court explained that

> "[o]nce [the] defendant offered to stipulate that he had possession of the gun subsequent to the alleged robbery, the only purpose that would be served by permitting the state to prove the subsequent crime would be to show that because [the] defendant had committed another crime he was a bad man and therefore probably committed the crime for which he was charged."

*Id.* at 54. Thus, the court concluded that the unfairly prejudicial effect of the evidence of the defendant's encounter with Charley outweighed its probative value and was not admissible.

Defendant also relies on *Old Chief*, in which the United States Supreme Court addressed, under the Federal Rules of Evidence (FRE),[10] an issue similar to the one presented in *Zimmerlee*. In *Old Chief*, the defendant was charged with, among other things, being a felon in possession of a firearm. The defendant had sought to exclude the evidence of the name and nature of his prior felony by stipulating that he previously had been convicted of a crime punishable by imprisonment exceeding one year. The Court

---

[10] FRE 401, which is identical to OEC 401, provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

FRE 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Although not identical in all respects to OEC 403, FRE 403 is identical in the respect addressed in *Old Chief*.

determined that the trial court should have excluded the evidence. The Court concluded that the defendant's stipulation provided evidence of equal evidentiary significance as the prosecutor's reading of defendant's official record of conviction. *Old Chief*, 519 US at 191. However, the defendant's stipulation did not present the tendency of unfair prejudice that the name and nature of his conviction presented.[11] The Court emphasized that the case was unique in that the fact to be proven was the defendant's "legal status" and that

> "[p]roving status without telling exactly why that status was imposed leaves no gap in the story of a defendant's subsequent criminality, and its demonstration by stipulation or admission neither displaces a chapter from a continuous sequence of conventional evidence nor comes across as an officious substitution, to confuse or offend or provoke reproach."

*Id.*

In all three of the cases discussed above, the excluded evidence was relevant only to prove a discrete fact in the case. Further, even without the defendants' offered stipulations, the excluded evidence in those cases had an undue tendency to suggest a decision on an improper basis. By offering to stipulate to the discrete fact that the prejudicial evidence was offered to prove, the defendants were able to tip the balance in favor of excluding the prejudicial evidence, because the stipulation provided a nonprejudicial alternate form of proof.

In contrast to those cases, defendant here sought to replace the state's photographic evidence with a lengthy series of terse stipulations. Those stipulations were not of equal evidentiary significance, because they would have left gaps in the prosecution's narrative of the crime. In addition, although defendant's stipulations would have covered much of what the state sought to prove with the photographs of the

---

[11] In *Old Chief*, the defendant's previous felony was assault causing serious bodily injury, which was similar to the current charge against the defendant of assault with a dangerous weapon. The Court had determined that the name of the prior offense presented a risk of unfair prejudice, because it had the tendency to suggest to the jury that, because the defendant had committed the prior assault, he was more likely to have committed the assault in the case before it. 519 US at 185.

victim's body, those stipulations could not replace the demonstrative value of the photographic evidence. The photographs illustrated the testimony of several of the state's witnesses and helped to clarify that testimony for the jury. The principles discussed in *Old Chief, Zimmerlee,* and *McKendall* are not applicable in this context.

We also note that this court previously has stated that photographs of a victim's body that are relevant are not unfairly prejudicial solely because they are graphic. *See State v. Barone,* 328 Or 68, 88, 969 P2d 1013 (1998), *cert den,* 528 US 1135 (2000) ("Although the photographs in question were graphic, they could not be said to be remarkable in the context of a murder trial."). Defendant has not suggested that the photographs in this case created a danger of undue prejudice other than to evoke a person's natural revulsion to death. We conclude that the trial court did not abuse its discretion in admitting the photographs and video of the victim's body.

## II. GUILT-PHASE ASSIGNMENTS OF ERROR

Defendant presents seven assignments of error that pertain to the guilt phase of his trial. Two of those assignments address comments that the prosecutor made during closing arguments. Defendant's arguments regarding those assignments are not well taken, and an extended discussion of them would not benefit the public, bench, or bar. Thus, we decline to address them further.

In five assignments of error, defendant argues that the trial court erred in failing to ensure jury unanimity on the charges of aggravated murder set out in counts 2 through 15 of the indictment.[12] With respect to counts 2, 6, and 11, which are based on the underlying crime of first-degree sexual abuse, defendant argues that the court should have instructed the jury that it must agree unanimously on the same incident of first-degree sexual abuse to find defendant guilty of aggravated murder as charged in those counts.

---

[12] Defendant concedes that those assignments of error do not pertain to count 1 of the indictment, which alleged that defendant committed the crime of aggravated murder by unlawfully and intentionally causing the death of the victim, who was a person under the age of 14 years. ORS 163.095(1)(f).

Defendant contends that the court's failure to do so violated the constitutional jury unanimity requirements under Article I, section 11, of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution.[13] Defendant makes identical arguments with respect to those aggravated murder counts that are based on the commission of the crime of first-degree kidnaping (counts 3, 7, and 12), second-degree kidnaping (counts 4, 8, and 13), first-degree attempted rape (counts 5, 9, and 14), and second-degree attempted rape (counts 10 and 15).

In a combined argument, defendant contends that the evidence presented at trial could have supported more than one instance of each of the five underlying crimes. Specifically, he argues that the state presented sufficient evidence to establish that each crime could have occurred at either, or both, of two distinct locations—defendant's bedroom, where he first brought the victim, or the railroad embankment, where police found the victim's body. Under those circumstances, defendant argues that there was a substantial likelihood of jury confusion and, therefore, that the trial court was required to instruct the jury that it must agree unanimously on the factual circumstances that constituted the elements of each underlying crime to convict defendant on a particular count of aggravated murder based on that crime. Defendant acknowledges that he did not object at trial to the jury instructions in that regard. However, he argues that this court should exercise its discretion to review the error as apparent on the face of the record, citing *State v. Lotches*, 331 Or 455, 472, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001).

In *Lotches*, this court addressed the jury unanimity rule in the aggravated murder context. In that case, the state had charged the defendant with three counts of aggravated murder of a single victim. Those counts were based on the underlying crimes of attempted first-degree robbery,

---

[13] Article I, section 11, provides, in part, that "a verdict of guilty of [capital] first degree murder * * * shall be found only by a unanimous verdict, and not otherwise[.]" The Fourteenth Amendment provides, in part, that "nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" *See Schad v. Arizona*, 501 US 624, 634 n 5, 111 S Ct 2491, 115 L Ed 2d 555 (1991) (stating that right to unanimous verdict is due process right).

attempted second-degree kidnaping, and attempted murder. The evidence presented at the defendant's trial would have supported more than one charge of each of the underlying crimes, because the defendant could have perpetrated each crime against more than one victim. The trial court did not identify for the jury the victim or attendant circumstances of any of the underlying crimes supporting each count of aggravated murder. The trial court also did not instruct the jury that it had to agree on the same set of facts to convict the defendant of each count of aggravated murder.

The court began by examining whether the instructions were adequate in light of *State v. Boots*, 308 Or 371, 780 P2d 725 (1989). In *Boots*, the state charged the defendant with aggravated murder based on two separate subsections of the aggravated murder statute—that defendant committed the murder in the course of and in the furtherance of robbery and that defendant committed the murder to conceal the identity of the robbers. The trial court had instructed the jury that the law did not require it to agree unanimously on either theory, so long as all 12 jurors agreed that the state had proven some combination of one or the other (or both) of the two alleged aggravating factors. On review, this court held that the instruction was erroneous because "[it] relieves the jury from seriously confronting the question whether they agree that any factual requirement of aggravated murder has been proved beyond a reasonable doubt, so long as each juror is willing to pick one theory or another." *Id.* at 375. The court, however, explained that "[w]e are not speaking here of factual details, such as whether a gun was a revolver or a pistol and whether it was held in the right or the left hand. We deal with facts that the law (or the indictment) has made essential to a crime." *Id.* at 379.

Applying *Boots* to the aggravated murder charges in *Lotches*, this court held that, "because the aggravated murder instructions that were given did not either limit the jury's consideration to a specified underlying felony or require jury unanimity concerning a choice among alternate felonies, each instruction carried the same danger that this court had condemned in *Boots*." *Lotches*, 331 Or at 469. The court illustrated the problem presented in that case:

"It is plain from the foregoing that the jury in the present case properly could not have convicted defendant of aggravated murder, for example, based on murder committed to conceal one's identity as the perpetrator of attempted murder, if half the jurors thought that defendant had attempted to murder Riley and half thought that he had attempted to murder Edwards. * * * [T]he unanimity rule requires that the jury agree as to 'just what defendant did' to bring himself within the purview of the particular subsection of the aggravated murder statute under which he was charged."

*Id.* at 468-69.

■ The court in *Lotches* also determined that, although the defendant had not raised the error at trial, the error was "apparent on the face of the record." The elements of plain error are: (1) the error must be one of law; (2) the legal point must be obvious, that is, not reasonably in dispute; and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it[.]" *State v. Brown,* 310 Or 347, 355, 800 P2d 259 (1990). In *Lotches,* the court determined that the first and third elements were satisfied because "the question of what must be included in a jury instruction is a question of law, and what was or was not included is determined readily by examining the instructions that were given." *Lotches,* 331 Or at 472. The court also concluded that the legal point was "obvious" because *Boots* had established that a jury must be instructed on "the necessity of agreement on all material elements of a charge in order to convict." *Id.* Because the factual distinctions between *Lotches* and *Boots* were not so significant "that a court reasonably could doubt what its duties respecting jury instructions would be[,]" the court concluded that the trial court's failure to provide an instruction on jury unanimity was error apparent on the face of the record. *Id.*

This court recently addressed the same issue as "error apparent on the face of the record" in *State v. Hale,* 335 Or 612, 75 P3d 448 (2003). In *Hale,* the state charged the defendant with six counts of aggravated murder based on the underlying crime of third-degree sexual abuse and four counts of aggravated murder based on the underlying crime of murder. At trial, the state presented evidence that the

defendant or the codefendant (or both) could have committed the crime of third-degree sexual abuse against one or more victims. Similarly, for the counts based on the underlying crime of murder, there were three murder victims and two possible perpetrators of that crime. This court concluded that

> "because the instructions that the jury was given with respect to each of the aggravated murder counts based on the crimes of third-degree sexual abuse and murder did not either limit the jury's consideration to a specific instance of third-degree sexual abuse or murder, committed by a particular perpetrator against a particular victim, or require jury unanimity concerning a choice among alternative scenarios, each instruction carried an impermissible danger of jury confusion as to the crime underlying each count."

*Hale*, 335 Or at 627. This court then concluded that it should address the error as "apparent on the face of the record" for the same reasons stated in *Lotches*. *Id.* at 630.

In this case, because it is the dispositive inquiry, we first address whether the error, if any, was "apparent on the face of the record." We agree that, as in *Lotches* and *Hale*, the first and third elements of the plain error doctrine are satisfied—that the error is one of law and that it appears "on the face of the record." However, unlike the error addressed in *Lotches* and *Hale*, we conclude that the legal point raised in this case was not "obvious."

Defendant asserts that, in light of *Lotches* and *Boots*, "the requirement of jury unanimity in aggravated murder cases is apparent." We agree with that statement as far as it goes. However, we disagree with defendant that the error in this case is obvious because it "suffers from the same defect identified in *Lotches*." In *Lotches*, there were multiple possible victims for each of the underlying crimes. Similarly, in *Hale*, there were multiple possible victims and two possible perpetrators of each of the underlying crimes. In both of those cases, the jury was presented with multiple factual theories for each of the underlying crimes. It is not reasonably in dispute that a jury's failure to agree unanimously on either *the victim* or *the perpetrator* of the crime would violate the jury unanimity rule, because both those facts are material elements of the underlying crimes.

In this case, however, it is not "obvious" that a jury's failure to agree unanimously on the precise location where defendant may have perpetrated the underlying crimes against the single victim would violate the jury unanimity rule. Nothing about the crimes charged in this case demonstrates that the precise location of the underlying crimes constitutes a material element of those crimes on which the jury must agree unanimously. In fact, the location of those crimes more logically constitutes a "factual detail" that does not require jury unanimity. *Boots*, 308 Or at 379. The line between those facts that are essential to the crime and those that are merely factual details may not always be clear. However, defendant does not explain why the location of the underlying crimes constitutes a fact that the law makes essential to those crimes, as *Boots* discussed, and we cannot agree, without more, that defendant's legal proposition is "obvious," as this court applied that standard in *Hale* and *Lotches*. Because we conclude that the specific error alleged by defendant is not "error apparent on the face of the record," we do not address whether the trial court erred in the manner that defendant contends. *See State v. Reyes-Camarena*, 330 Or 431, 436, 7 P3d 522 (2000) (declining to address asserted error as apparent on face of record because legal point raised was not obvious).

## III. PENALTY-PHASE ASSIGNMENTS OF ERROR

Defendant raises 11 assignments of error that pertain to the penalty phase of his trial. Two of those assignments raise issues that this court previously has answered contrary to defendant's position.[14] Therefore, we do not discuss them further. However, defendant's remaining assignments of error present issues that warrant further discussion.

---

[14] In one of those assignments of error, defendant argues that the trial court erred in admitting as victim impact evidence the diary of the victim's mother. Defendant argues that the diary was hearsay not admissible under the prior recollection recorded exception. *See* OEC 802 ("Hearsay is not admissible except as provided in * * * [OEC 801 to 806] or as otherwise provided by law."); OEC 803(5) (providing hearsay exception for "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately * * *"). However, the trial court also had admitted the diary under the state of mind exception. *See* OEC 803(3)

## A. *Victim Impact Evidence*

■　In two assignments of error, defendant argues that the trial court erred in allowing nonfamily members of the victim to present victim impact evidence during the penalty phase. ORS 163.150(1)(a) provides, in part:

> "In the [sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection[.]"

Before the penalty phase began, defendant moved to exclude witnesses who were not family members of the victim, but who defendant expected would testify as to the personal characteristics of the victim. Defendant argued that ORS 163.150(1)(a) does not permit persons who are not "victims," as defined in ORS 131.007,[15] to present victim impact evidence. Defendant also asserted that the evidence was not relevant to the three questions that the court submitted to the jury under ORS 163.150(1)(b), because the victim's character was not at issue.

The trial court determined that the evidence of the victim's personal characteristics was admissible regardless of whether defendant attacked the victim's character. The court further stated that the statute did not prohibit the state "from introducing appropriate character evidence regarding the victim from third persons who are not members of the victim's family [or] otherwise legally defined as a victim." After

---

(providing hearsay exception for "[a] statement of the declarant's then existing state of mind * * *"). Because defendant does not argue that the trial court improperly admitted the diary under the state of mind exception, we decline to address that assignment of error further.

[15] ORS 131.007 provides:

"As used in ORS 40.385, 135.230, 135.406, 135.970, 147.417, 147.419 and 147.421 and in ORS chapters 136, 137 and 144, except as otherwise specifically provided or unless the context requires otherwise, 'victim' means the person or persons who have suffered financial, social, psychological or physical harm as a result of a crime and includes, in the case of a homicide or abuse of corpse in any degree, a member of the immediate family of the decedent and, in the case of a minor victim, the legal guardian of the minor. In no event shall the criminal defendant be considered a victim."

the court ruled, defendant moved for a mistrial on the same grounds, which the trial court denied.

On review, defendant argues that the legislative history of the 1995 amendments to ORS 163.150(1)(a) show that the legislature intended that the trial court would allow only members of the victim's family to present victim impact evidence during the penalty-phase proceeding. Defendant contends that such a limitation would keep victim impact evidence within the bounds of the type of evidence contemplated in *Payne v. Tennessee*, 501 US 808, 111 S Ct 2597, 115 L Ed 2d 720 (1991). Defendant also argues that victim impact evidence presented by nonfamily members is not relevant to the question set out in ORS 163.150(1)(b)(D), that is, whether defendant should receive the death penalty.[16]

The arguments that defendant raises require us to discern the intent of the legislature when it enacted the 1995 amendments to ORS 163.150(1)(a).[17] In doing so, we first examine the text and context of the statute, and, if the legislature's intent is clear, we look no further. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (providing template for statutory construction).

ORS 163.150(1)(a) allows the introduction of "victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family * * *[.]" The statute limits the scope of victim impact evidence that the court may deem relevant to sentencing. However, the statute contains no limitations regarding the relationship between the victim and a witness who may present victim impact evidence. As a general rule, the Oregon Evidence Code does not limit the witnesses who may present relevant and otherwise admissible evidence, as long as any witness is

---

[16] Defendant also argues that, as a matter of statutory interpretation, the court must limit the scope of victim impact evidence, because otherwise "unlimited, unreliable and impermissible factors" come into the death decision. However, defendant does not argue that the scope of the victim impact evidence here was impermissible. Rather, he objected to the victim impact evidence on the basis of *who* presented it. Thus, we do not address the aspect of defendant's argument related to the scope of the victim impact evidence.

[17] In 1995, the legislature amended ORS 163.150(1)(a) to include the text pertaining to victim impact evidence. Or Laws 1995, ch 531, § 2; Or Laws 1995, ch 657, § 23.

competent to testify about the matter. *See* OEC 601 (providing that any person who can perceive and communicate may be witness); OEC 602 (providing that witness may testify to matter of which witness has personal knowledge). Those provisions stand in contrast to other provisions of law that do specify who has a right to present information to the court. *See, e.g.,* Or Const, Art I, § 42 (granting to "victims," in prosecutions for crime, the right "to be heard at * * * the sentencing * * *").

We conclude that ORS 163.150(1)(a) does not limit the witnesses who may present victim impact evidence as long as the evidence that they present is within the permissible scope of what constitutes victim impact evidence that is relevant to sentencing. That is, the evidence must pertain, in the words of the statute, to "the personal characteristics of the victim or the impact of the crime on the victim's family." Because defendant does not argue that the victim impact evidence actually presented during his penalty-phase proceeding was not within the scope of the statute, we conclude that the trial court did not err in allowing nonfamily members of the victim to present victim impact evidence.

B. *Future Dangerousness*

■ In three assignments of error, defendant argues that the trial court erred in overruling his relevance objections to the admission of (1) photographs of display boards of knives, drug paraphernalia, and tattoo guns that corrections officers had confiscated from inmates at the Oregon State Penitentiary; (2) testimony about gang violence in prison; and (3) testimony about inmate violence used to enforce the "inmate code."[18] Defendant also assigns error to the trial court's denial of his motion for mistrial based on the admission of the photographs of confiscated items.

■ ■ To be admissible under OEC 401,[19] evidence presented in a death-penalty sentencing proceeding must be relevant to one or more of the statutory questions that ORS

_____

[18] Detective Hepler testified for the state that the phrase "inmate code" refers to the tendency of some prison inmates to retaliate against other inmates for perceived insults and other transgressions by ganging up on and assaulting an offending inmate when prison guards are not present.

[19] OEC 401 provides:

163.150(1)(b) requires the jury to answer. *State v. Wright*, 323 Or 8, 15, 913 P2d 321 (1996). Those questions are:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"* * * * *

"(D) Whether the defendant should receive a death sentence."

ORS 163.150(1)(b). We review trial court determinations of relevance under OEC 401 for errors of law. *Titus*, 328 Or at 481.

Before the presentation of evidence in the penalty-phase proceeding, defendant made an oral motion *in limine* to exclude the photographs of items confiscated from prison inmates. Defendant argued that that evidence was not relevant to the question of defendant's future dangerousness and was unfairly prejudicial. Defendant contended that the state was offering the evidence to imply improperly that, because other inmates had made weapons in prison, defendant would make a weapon in prison. The state responded that it was offering the evidence to illustrate its witness's testimony about opportunities for inmate violence in prison.

The trial court disagreed with defendant and stated that

"I think that the jury is entitled to see what it is like there [in prison] and decide whether or not regardless of whether [defendant] makes a knife, whether he is going to be dangerous to some other inmate.

"I think you made it pretty clear in your opening statement your intention is to show he is not dangerous to the people he is going to be around which are adult males.

_____

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"So, I think they [the jury] are entitled to see what opportunities, if any, there are for him within the context of prison life * * *."

After reviewing the photographs of the confiscated items, the court denied defendant's motion. The court concluded:

"I think, generally speaking, the availability of an opportunity to make a weapon in prison is all we are talking about here.

"Obviously, you will be able to argue whether or not [defendant] is so inclined, but I think probably the State, well, the general perception of the public is that people in prison don't have access to weapons and consequently they can't be dangerous.

"And I think the State is entitled to offer evidence to suggest if they are creative and decide they want to make a weapon, they can. Now, whether or not [defendant] will be one of those people will be something the jury will have to decide. Your motion on those photo[s] is denied."

Before the testimony of the state's witness, Detective Hepler, defendant renewed his objection and moved for mistrial. The court overruled those objections and denied defendant's motion.

Hepler then testified about many aspects of life in prison, including prisoners' use of weapons, prison gangs, and the "inmate code." During that testimony, defendant objected, on the grounds of relevance, to Hepler's testimony that there are gangs in prison and that, on occasion, prison officials have had to transfer inmates between facilities to equalize the size of rival gangs to reduce violence. Defendant argued that that testimony was not relevant to the question of his future dangerousness because it was not connected to defendant's own conduct. Defendant also objected, on the grounds of relevance, to Hepler's testimony that inmates use violence to enforce the "inmate code."[20] The court overruled those objections.

---

[20] Following much of Hepler's testimony, defendant also moved to strike that testimony and moved for a mistrial, on the ground that the evidence was not relevant to the question of defendant's future dangerousness. The trial court denied those motions. However, defendant does not now assign error to those rulings.

On review, defendant argues that the evidence reviewed above allowed the state to prove his future dangerousness through evidence that was probative only of the bad acts of others. He contends that the state offered the evidence to show that, because prison is dangerous and some inmates are violent, defendant will be violent in prison. However, defendant asserts that only evidence that relates to his past conduct in prison is relevant to the question of whether he will be dangerous in the future in prison. Defendant further argues that it is necessary to limit the evidence considered relevant to the future dangerousness question, because, otherwise, courts will allow the state to introduce evidence that constitutes an impermissible aggravating factor on the question of whether a defendant should receive the death penalty.

The state responds that it presented the evidence for the purpose of explaining to the jurors that inmates have many opportunities to inflict injuries or death on other inmates and that prison staff cannot always control the violence that occurs in prison. Because defendant argued that he would not be dangerous in "prison society," the state argues that a description of that society was relevant to the jury's determination of defendant's future dangerousness.

In addressing defendant's contentions, we begin with the question set out in ORS 163.150(1)(b)(B), which asks the jury to decide "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" This court previously has held that whether a defendant will be a danger to "society" includes the consideration of whether that defendant will be a danger to prison society. *State v. Douglas*, 310 Or 438, 450, 800 P2d 288 (1990) ("Society includes prison society, as well as society at large. When the jury considers the threat that the defendant might pose because of future violent crimes, it may consider the threat to prison society.").

■ Our inquiry whether the state's evidence was relevant to the question of defendant's future dangerousness begins, and ends, with the proper characterization of the purpose for which the state offered Hepler's testimony and the

photographs of confiscated items. The state offered that evidence to explain and demonstrate the nature of "prison society" and the opportunities for violence within that setting. Because the statutory question required the jury, in the context of this case, to decide the disputed fact of whether defendant would be dangerous in prison society, the jury necessarily needed to understand the nature of that society. In contrast to a juror's knowledge of "outside" society, jurors ordinarily will not have the personal experience or expertise to know what opportunities for violence exist in the prison setting. In general, background information that a party offers as an aid to understanding a disputed issue is admissible. *See* Kirkpatrick, *Oregon Evidence* § 401.02 at Art IV-4 ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding.").

In our view, defendant's argument is incorrect because it assumes that Hepler's testimony and the challenged photographs solely pertained to the potential dangerousness of *other* prison inmates. To the contrary, that evidence described part of the violent characteristics of the institution in which defendant would be confined in the immediate future. Evidence of that violent institutional environment can assist jurors in understanding whether defendant would face a significant risk in prison of involvement in violent acts against others and, perhaps, the use of weapons that the environment affords. Thus, the state's evidence, properly understood, does pertain to defendant, and helps the jury understand, at least to some degree, the probability that defendant will commit criminal acts of violence in the future.

Moreover, defendant made the distinction between prison society and outside society relevant to the question of his future dangerousness by arguing that he would not be a danger in prison. It follows that the background information that provided the necessary context for the jury to resolve that disputed issue also was relevant.

We conclude that the evidence to which defendant objected was properly admissible as relevant to the question

of his future dangerousness under ORS 163.150(1)(b)(B). The trial court did not err.

C. *State's Closing Arguments*

In two assignments of error, defendant contends that the trial court erred in failing to act *sua sponte* by giving a curative instruction or by granting a mistrial because of the following remarks that the prosecutor made during closing arguments:

> "[PROSECUTOR]: * * *

> "Is it more likely than not Defendant will commit criminal acts of violence that will constitute a continuing threat to society?

> "What is society, Ladies and Gentlemen? What did the legislature mean when they wrote that word into the statute? Did they mean [a] group of people that have been exiled from the community to prison?

> "Or did they mean the place where you and I live, where a system of community of life which individuals form a continuous and regulatory association for their mutual benefit and protection. Webster indicates this is a voluntary association of people. Prison is not a voluntary association of people.

> "[DEFENSE COUNSEL]: Objection. Webster is not in evidence.

> "THE COURT: Overruled.

> "[PROSECUTOR]: Community or nation or broad grouping of people having traditions, institutions and collective activities or interest.

> "That is not a prison. What the normal ordinary common meaning of that word is that community in which we live in, does the Defendant justify in receiving the death penalty because he is a continuing threat to live anyplace where people congregate.

> "Words have their ordinary and common meaning. The question to be addressed is [defendant] a danger to this community out here? And that is the issue that the state must prove beyond a reasonable doubt, is he a danger to the areas where we live?

"\* \* \* \* \*

"So, I am going to argue in the alternative maybe one of you is thinking it might be okay to leave him in prison. Maybe that would be a sufficient society. That is not what the legislature intended, but maybe you are thinking that."

Defendant argues, and the state concedes, that the prosecutor misstated the law on what constitutes "society" under the future dangerousness question, because this court has held that "society" includes prison society. *See, e.g., Douglas*, 310 Or at 450. Because defendant's argument in the penalty phase of his trial was that he would not be dangerous in prison and, therefore, should receive a sentence less than death, defendant asserts that the prosecutor's deliberate misstatement of the law deprived him of a fair sentencing proceeding.

The state responds that, in the context of the prosecutor's entire closing arguments, defense counsel's closing arguments, and the jury instructions, defendant was not denied a fair trial. The state first points out that, although the prosecutor argued that "society" does not include prison, the prosecutor acknowledged that prison "society" might be relevant to the question of future dangerousness and, at length, argued to the jury that defendant would be dangerous in prison. In addition, the state points out that defense counsel told the jury that it had the power to define "society," and that it could decide that prison society was a sufficient society for defendant. Finally, the state argues that, in light of the trial court's instructions to the jury that they "must follow these instructions[,]" that "[y]our answers to the questions should be based on only the evidence and these instructions[,]" and that "[t]he attorneys' statements and arguments are not evidence[,]" the prosecutor's arguments did not deny defendant a fair trial.

Defendant acknowledges that he took no action during the proceeding to preserve this claim of error.[21] However,

---

[21] Defendant, however, did object to the prosecutor's use of Webster's Dictionary and he assigns error to the trial court's decision to overrule that objection. However, defense counsel stated that the grounds for that objection was that Webster's "[wa]s not in evidence." On review, defendant does not appear to argue that the prosecution's reference to Webster's was improper because it "[wa]s not in

he requests that we exercise our discretion to consider it as an "error apparent on the face of the record[.]" ORAP 5.45(6); *Brown*, 310 Or at 355. Defendant asserts that this court may address the error as apparent on the face of the record because it is not reasonably in dispute that "society," under ORS 163.150(1)(b)(B), includes prison society.

 A trial court's failure to grant a mistrial *sua sponte* constitutes error apparent on the face of the record "only if it is beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial." *State v. Montez*, 324 Or 343, 357, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997). *See also State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990) ("Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial."). We have reviewed defendant's claim of error, and we conclude that the prosecutor's argument was not so prejudicial that "it is beyond dispute" that this court can say that the trial court's failure to give a curative instruction or grant a mistrial *sua sponte* denied defendant a fair trial.

### D. *Judgment of Conviction*

 Finally, defendant argues that the trial court improperly entered more than one sentence of death, because the judgment of conviction stated that defendant "is sentenced to death on all fifteen counts [of aggravated murder] as provided in ORS 163.150(1)(f)."[22] The state responds that the trial court only sentenced defendant to a single sentence of death, because the phrase "on all fifteen counts" indicates only the reason for the sentence—it does not impose multiple sentences of death.

---

evidence." Rather, defendant now argues that the court should have sustained his objection because the prosecution, by referring to Webster's, provided the jury with an incorrect definition of "society." However, defense counsel did not alert the trial court that he objected to the prosecutor's comment on the ground that the definition of "society" was incorrect or that the prosecutor's argument was improper.

[22] On review, defendant does not argue that the trial court improperly entered 15 *convictions* of aggravated murder. Rather, he argues only that the trial court improperly entered multiple *sentences* of death.

Defendant is correct that the court may sentence him to only a single sentence of death for the aggravated murder of a single victim. *See State v. Barrett*, 331 Or 27, 37, 10 P3d 901 (2000) (holding that "appropriate procedure would have been to enter one judgment of conviction reflecting the defendant's guilt on the charge of aggravated murder, which judgment separately would enumerate each of the existing aggravating factors"); *Hale*, 335 Or at 631 (holding that "[e]ach judgment should enumerate separately the aggravating factors on which each conviction was based * * * [and] each judgment entering a single conviction for aggravated murder for each victim should impose a single sentence of death"). However, here, the judgment of conviction does not purport to impose multiple sentences of death on defendant. Rather, it states that defendant "*is sentenced to death* on all fifteen counts as provided in ORS 163.150(1)(f)." (Emphasis added.) We read the judgment to conform with the law, which allows a single sentence of death under the circumstances of this case. Thus, we conclude that it is not necessary to remand for entry of a corrected judgment.

## IV. CONCLUSION

We conclude that none of defendant's assignments of error is well taken. Accordingly, we affirm defendant's conviction and sentence of death.

The judgment of conviction and the sentence of death are affirmed.